ROBERTS, BUTLER & COMPANY, *et al.*, Appellants, v. B. S. PRESS, H. D. COPELAND, *et al.*

**Fraudulent Conveyance:** DEED TO CREDITOR. A mortgage of a debtor's entire stock, to secure the claim of a creditor, who had assumed other *bona fide* indebtedness of his debtor, for the purpose of procuring a loan for the latter, is valid, notwithstanding a fraudulent intent on the part of the mortgagor, if the mortgagee had no knowledge of such intent, nor of facts which should have put him on inquiry.

**General Assignment:** INTENT. Whether certain acts constitute a general assignment, for the benefit of creditors, is to be determined by the intent of the parties.

SAME. A mortgage of an insolvent debtor's entire stock, to secure particular creditors, without any intent to make a general assignment, is valid, though a short time thereafter the debtor does, in fact, execute such assignment.

STATUTE CONSTRUED. Code, 2115, providing that no general assignment by an insolvent, for the benefit of creditors, shall be valid unless made for the benefit of all, in proportion to the amount of their respective claims, uses the word "assignment" in its technical sense, and does not affect general transfers of the debtor's property.

SAME. A mortgage of an insolvent debtor's entire property, to secure particular creditors, thereby defeating other creditors in the collection of their debts, is not a general assignment for the benefit of creditors, within Code, section 2115, forbidding preferences in such assignments.

*Appeal from   Clark   District   Court.*—HON. W. H. TEDFORD, Judge.

THURSDAY, APRIL 9, 1896.

ACTION in equity to set aside certain chattel mortgages as having been executed in fraud of creditors, or to decree them to constitute an assignment for the

benefit of creditors. Decree dismissing plaintiffs' bill at their costs, and establishing the lien of said mortgages in favor of the defendants. Plaintiffs appeal.— *Affirmed.*

*Temple & Hardinger* and *W. H. Park* for appellants.

*T. M. Stuart* and *McIntire Bros. & Jameson* for appellees.

KINNE, J.—I. In March, 1892, the defendant, B. S. Press, opened a clothing store in the city of Osceola, Iowa. He had a capital of from three to five thousand dollars. Up to January, 1893, he was carrying a stock of from five to eight thousand dollars, for one-half of which he was indebted. At the latter date he moved into a much larger room, and at the same time increased his stock, and added new lines of goods thereto, so that it reached in value from eighteen to twenty thousand dollars. The financial panic of 1893 overtook him, his sales fell off, some of his bills became due, and from time to time, he borrowed of various parties large sums of money to meet them. In this way he had met the demands against him up to about the last of June, 1893. He then owed, for money borrowed, to H. D. Copeland, five hundred, to the First National Bank of Chariton, three thousand five hundred and fifty dollars; to the Chariton Bank of Chariton, seven hundred and fifty dollars; to the Iowa State Bank of Osceola, Iowa, three thousand dollars. Some of these obligations were due, or about to become due, and the defendant undertook to raise money with which to pay them, as well as to pay or secure such of them as would thereafter mature. Such arrangements were made that the First National Bank of Chariton, agreed to loan said Press, the further sum of one thousand two hundred and fifty dollars, with which to pay

the seven hundred and fifty dollars due the Chariton Bank, and the five hundred dollars due to Copeland, and to extend time on the three thousand five hundred and fifty dollars which Press owed it, providing Copeland would sign all of the notes, including the one thousand two hundred and fifty dollar note, as a maker, and became personally liable to said bank on all of said notes; and on the further condition that Copeland should obtain a mortgage on the entire stock of goods and fixtures, then owned by said Press, to secure all of said indebtedness, as well as the three thousand dollars owing to the Osceola Bank, which Copeland was to, and did, assume. As a part of the arrangement, Copeland was to take immediate possession of said stock of merchandise, fixtures, and accounts, and to sell the goods without sacrifice, and apply the proceeds, less the costs and expenses attending the sale, pro rata on said debts until they were paid. The total sum for which Copeland thus obligated himself was seven thousand eight hundred dollars, which sum the mortgage was made to secure. Copeland took possession at once under the mortgage, and proceeded to sell the goods, as agreed upon. When he took possession, the goods invoiced sixteen thousand, one hundred and seventy dollars and eighty cents, including fixtures, and six hundred and eighty-six dollars and fifty cents of accounts. He sold goods amounting in the aggregate to about nine thousand dollars, and out of said sum paid about two thousand dollars in expenses. The difference,—six thousand, eight hundred and ninety-one dollars and forty-nine cents,—he applied on the indebtedness which the mortgage secured. After the execution and delivery of the mortgage to Copeland, and on the same day, Press executed his note, due one day after date, to Ida Press, his brother's wife, for one thousand five hundred dollars, securing the same by

mortgage on the same goods.   On July 3, 1893, at the
suggestion of Simon Press, his uncle, he executed
chattel mortgages on the same stock to plaintiffs, and
to Meyer Engle & Co., creditors, to secure their claims,
which mortgages were duly recorded.   It appears that
Copeland had no part in the execution of these two
mortgages.   At the time Press executed the mortgage
to Copeland, he was indebted to plaintiffs and to
Meyer Engel & Co. in the sum of six thousand
dollars, or over, which sum was unsecured, except as
above stated.   Roberts, Butler & Co. refused to
accept the mortgage made to them, and with some
seventeen other creditors, proceeded to obtain judg-
ments against B. S. Press upon their claims, which
judgments, in the aggregate, amounted to about
seven thousand dollars, exclusive of interest and costs.
Several of these creditors caused attachments to issue,
and garnished the defendant Copeland thereon.   It
appears, without conflict, that when Copeland took his
mortgage he had no knowledge as to the existence of
these debts of Press, for goods purchased.   October 9,
1893, said general creditors filed a bill in equity in
this cause, making the mortgagor, B. S. Press, the
mortgagees, Copeland, Ida Press, and Meyer Engle &
Co., also Simon Press and E. M. Press, parties defend-
ants.   All of said defendants, except Meyer Engle &
Co., who were non-residents, appeared, and filed
answers in said cause.   The bill charged a conspiracy
between the defendant B. S. Press, Copeland, and the
other defendants Press, for the purpose of incumbering
and concealing the property of B. S. Press from plaint-
iffs, and for the purpose of defrauding them, and
prayed that said mortgages might be decreed fraudu-
lent, or, if they were found not so, then that said mort-
gages be decreed to constitute a general assignment
for the benefit of all creditors.   All of the defendants,
except Meyer Engle & Co., who were not served with

notice, made full answers to said bill, denying any fraud or conspiracy, and averring that said mortgages were given to secure a *bona fide* indebtedness, and defendant Copeland fully stated the manner and circumstances under which he came to take the mortgage on the goods. The pleadings cover forty printed pages, but the foregoing is a fair statement of the substance of them, as also of some of the facts elicited upon the trial. The court entered a decree dismissing plaintiffs' bill, and adjudging that they pay the costs; also established the lien of the mortgages of Ida Press, and Meyer Engle & Co., on the goods, subject to Copeland's mortgage, and providing that any balance remaining, after satisfying said mortgages, should be paid plaintiffs, in the order of date of their garnishments of Copeland.

II.   Plantiffs first claim that the transfer of the goods, by the mortgages, was fraudulent and void, as to them. It may be admitted that, if the determination of this question rested alone on the evidence or acts of B. S. Press, it would be easy of solution. It is not enough to set aside these mortgages to show that B. S. Press intended, in executing them, to defraud his creditors. It must also appear that any fraud which was intended to be perpetrated by B. S. Press, was known to the mortgagees. It may, we think, be conceded that B. S. Press has not satisfactorily accounted for the property he was possessed of. As to goods sold by him, prior to the execution of these mortgages, it appears he has not accounted for the proceeds. The evidence in that respect is not such as to justify the belief that he has applied all the proceeds of such sales to his indebtedness, save what was necessarily expended in carrying on the business, and in the support of himself and family. What he did with the money thus received does not appear, but there is no

evidence showing that these mortgagees, or the other defendants ever received any of it, or were in any manner concerned in its disposition. We first direct our attention to the case of Copeland. Admitting that there was a fraudulent intent on part of B. S. Press, we inquire, what is there that shows that Copeland was a party to it? In what way, if at all, did Copeland unite in such intended fraud? What facts appear from which we would be justified in holding that he was an actor,—a participant,—in the fraud of B. S. Press, or that he had, or should have had, any knowledge of it? It very satisfactorily appears that Copeland had no knowledge whatever that B. S. Press was indebted to plaintiffs. It stands undisputed that every dollar of the indebtedness for which the Copeland mortgage was given, was a *bona fide* debt of B. S. Press. Copeland had, prior to the execution of this mortgage, become obligated to pay the entire debt, which his mortgage was thereafter made to secure. He was not an intermeddler in the transaction. He was himself a creditor of B. S. Press, and, as such, had a perfect right to secure himself, and to borrow for Press the one thousand two hundred and fifty dollars. Nor was his act in rendering himself liable to pay other legitimate indebtedness of B. S. Press indicative of any fraudulent intent. His acts in procuring the loan of the one thousand two hundred dollars, in becoming obligated to the banks to pay the debts of B. S. Press, and in securing such liability by mortgage on the goods, were in and of themselves legal and proper, and in such a case fraud on his part cannot be assumed; it must be shown to have existed. *Stewart v. Bank*, 76 Iowa, 571 (41 N. W. Rep. 318). The law is well settled that such a mortgage will not be set aside when it is executed upon a consideration, unless it is shown that there was fraud on the part of

the grantor, which was participated in by the grantee, to the extent at least, of knowledge on the part of the grantee of the grantor's fraudulent intent, or of facts and circumstances such as, in law, should put the grantee upon inquiry. *Steele v. Ward*, 25 Iowa, 535; *Kellog v. Aherin*, 48 Iowa, 299; *Preston v. Turner*, 36 Iowa, 671; *Jones v. Hetherington*, 45 Iowa, 681; *Williamson v. Wachenheim*, 58 Iowa, 277 (12 N. W. Rep. 302); *Spaulding v. Adams*, 63 Iowa, 437 (19 N. W. Rep. 341). Even had it been shown that Copeland, when he took his mortgage, knew of the existence of other creditors whose claims were not secured, and that the effect would be to postpone or defeat them, such facts would not affect the validity of his mortgage in the absence of any fradulent intent on his part. *Bryant v. Fink*, 75 Iowa, 516 (39 N. W. Rep. 820); *Rollins v. Carriage Co.*, 80 Iowa, 380 (45 N. W. Rep. 1037); *Aulman v. Aulman*, 71 Iowa, 124 (32 N. W. Rep. 240); *Burtis v. Bank*, 77 Iowa, 103 (41 N. W. Rep. 585); *Stroff v. Swarford*, 81 Iowa, 695 (47 N. W. Rep. 1023); *Goodenow v. Friott*, 89 Iowa, 671 (57 N. W. Rep. 497). In this case, however, it does not appear that when Copeland took his mortgage he had any knowledge that Press had other creditors. It is not necessary to pursue this subject further, so far as Copeland is concerned. His is a case of securing an indebtedness which was in all respects legal and just. He says that in so doing he had no fraudulent intent or purpose, and no intent to hinder and delay others in the collection of their debts. There is no evidence to the contrary. That his act resulted in an injury to plaintiffs, is no reason for decreeing his mortgage void, inasmuch as it appears he acted in good faith, and with no wrongful intent. It is not made to appear that either E. M. Press, or Simon Press, her agent, in any way conspired with anyone touching the execution of either of these mortgages, or that they, or either of them,

received the proceeds of the sales made by B. S. Press, or had any knowledge as to how they were appropriated. The burden is on plaintiffs attacking these mortgages, for fraud, to establish the fact of the fraudulent intent of B. S. Press; as also the further fact that the defendant knew of his fraud, if any, and participated therein, to the extent heretofore stated. As to all of the mortgages, the proof in this respect has failed, and as to the mortgages of Ida Press, and Meyer Engle & Co., there is no evidence whatever which can be held even to tend to overcome the presumption which the law raises in their favor.

III. Finally, it is contended that the legal effect of the transaction we have been considering, is that of a general assignment with preferences, and hence, in contravention of the provisions of section 2115 of the Code, which reads: "No general assignment of property by an insolvent, or in contemplation of insolvency, for the benefit of creditors, shall be valid, unless it be made for the benefit of all his creditors in proportion to the amount of their respective claims." We have held that this statute does not affect general transfers of the debtor's property, but relates only to general assignments, and uses the latter word in its technical sense. *Lampson v. Arnold*, 19 Iowa, 479. We are not called upon to review the many cases decided by this court, touching what acts will constitute a transaction, a general assignment for the benefit of creditors. It has often been held that, whether or not certain acts would constitute such an assignment, was a question to be determined by the intent of the parties. *Kohn v. Clement*, 58 Iowa, 589 (12 N.W. Rep. 550); *Bank v. Crittenden*, 66 Iowa, 237 (23 N. W. Rep. 646); *Letts, Fletcher & Co. v. McMaster*, 83 Iowa, 455 (49 N. W. Rep. 1035); *Gage v. Parry*, 69 Iowa, 605 (29 N.W. Rep. 822); *Aulman v. Aulman*, 71 Iowa, 124 (32 N. W. Rep. 240);

*Perry v. Vezina*, 63 Iowa, 25 (18 N. W. Rep. 657); *Farwell v. Cunningham*, 86 Iowa, 67 (52 N. W. Rep. 1126). With this rule in mind, let us turn to the facts. There is an entire absence of evidence as to any intent on the part of B. S. Press to make an assignment for the benefit of creditors. It does not appear that such a proposition was ever thought of, much less discussed. It does not appear that B. S. Press intended to give a mortgage to Copeland, or any one else. He went to Chariton, on June 29, for the purpose of obtaining an extension of time on his indebtedness to the banks, expecting thereby to be enabled to continue his business. So far as appears, the matter of giving a mortgage on his stock, was never mentioned by him until he was told that he could not obtain the desired extension of his paper unless he did so. There is nothing in the instruments themselves, to indicate that Press intended to make an assignment. The evidence is silent as to such an intent. His, was a plain intent and attempt, to secure certain creditors, by placing mortgages on his stock of goods. That he was insolvent, and mortgaged his entire property to secure certain of his creditors, and by so doing, other creditors were defeated in the collection of their debts, does not constitute such act an assignment for the benefit of creditors. *Lampson v. Arnold*, 19 Iowa, 479; *Clement v. Johnson*, 85 Iowa, 569 (52 N. W. Rep. 502). It is equally well settled that, where a debtor gives security to a part of his creditors, without intending to make a general assignment, for the benefit of all of them, the transaction is valid, even though, a short time thereafter, and on the same day, he concludes to, and does, execute such an assignment. *Gage v. Parry*, 69 Iowa, 605 (29 N. W. Rep. 822); *Aulman v. Aulman*, 71 Iowa, 124 (32 N. W. Rep. 240); *Clement v. Johnson*, 85 Iowa, 569 (52 N. W. Rep. 502. But it is not necessary to

multiply authorities, as the facts of this case fail to show any intent to make an assignment for the benefit of creditors. A patient examination of all of the facts disclosed by the record in this case, convinces us that the decree should be AFFIRMED.