CARL & TOBEY COMPANY *v.* BEAL & FLETCHER COMPANY.

Opinion delivered October 30, 1897.

PURCHASE FROM INSOLVENT—EFFECT AS TO CREDITORS.—If a creditor, having notice of his debtor's insolvency and of his intention to defraud his creditors, purchase his entire stock of goods for a sum largely in excess of his own claim, paying the balance above his claim in cash, when the

nature of the property does not make it necessary that he should pur-
chase more than the amount of his own claim, the transaction is a fraud
upon the rights of other creditors.  (Page 379.)

EVIDENCE—COMPETENCY.—Where, in an attachment suit, the issue upon a
plea of intervention is by consent tried along with the attachment issue,
evidence which would have been competent had the attachment issue
been tried alone cannot be objected to by the party intervening.  (Page
381.)

Appeal from Hempstead Circuit Court.

RUFUS D. HEARN, Judge.

### STATEMENT BY THE COURT.

This was an action by attachment brought by Beal &
Fletcher Grocer Company against W. L. Page and Mary C.
Baldwin, partners doing business under the firm name of W.
L. Page & Co.  The writ of attachment was levied upon a
stock of goods in the possession of the Carl & Tobey Company,
which stock of goods had been purchased from the defendants,
W. L. Page & Co.  The defendants, Page & Co:, did not
dispute plaintiff's debt, but filed an affidavit controverting the
grounds of the attachment.

The Carl & Tobey Company also interpleaded, and claimed
the goods by virtue of their purchase from Page & Company.
The issue raised by the controverting affidavit of defendants
denying the grounds of the attachment, and that raised by the
interplea of the Carl & Tobey Company and the answer of
plaintiff thereto, were submitted to the court without a jury.

Upon the trial it appeared from the evidence that the defend-
ants, W. L. Page & Co., before the sale of the stock of goods in
question to the Carl & Tobey Company, were engaged in mercan-
tile business at Hope, Arkansas.  Their entire assets consisted,
according to the testimony of Page, which is undisputed on this
point, of the stock of goods which they afterwards sold to the
Carl & Tobey Company, $186 in bank, and "some book accounts,
some of which were worthless."  The firm owed mercantile debts
to the amount of about $1,500, and also Mrs. Chapman, a
sister-in-law of Page, about $500.  Among the creditors of
the firm was the Carl & Tobey Company, of Little Rock, whose
debt, amounting to $547, was past due and unpaid.  Its
traveling salesman, Mr. Young, had called on defendants several ·

times for the purpose of collecting the debt, but failed to get anything. The claim was then placed in the hands of an attorney for collection. He called several times upon defendants, and endeavored to induce them to pay the claim. As an inducement for them to pay, he offered to purchase enough goods from them to pay the claim of the Carl & Tobey Company, but they refused to satisfy the claim in any other way, except by sale of the entire stock of goods. In the meantime, the Oliver-Finnie Grocer Co., another creditor of defendants to the extent of about $78, had commenced suit against defendants to recover its debt. The attorney for the Carl & Tobey Company, having notice of this action by the Oliver-Finnie Grocer Co., afterwards purchased the entire stock of goods of the defendants at 85 cents on the dollar. He paid for the goods by satisfying the claim of his client against defendants, and the balance, amounting to about $1,100, was paid in cash.

The other evidence will sufficiently appear from the opinion. The court sustained the attachment, found against the interpleaders, dismissed the interplea, and gave judgment against the defendants and the sureties upon the bond of interpleaders for the amount of plaintiff's claim, from which judgment interpleaders have appealed.

*Ratcliffe & Fletcher*, for appellant.

There is no fraud in the sale made to the appellant. 4 So. 151; 84 Ala. 256; 22 So. (Ala.) 505. Mrs. Page had a right to demand pay for her services as book-keeper, and to hold same free from any claims of her husband. 47 Ark. 485; 70 N. W. 731. Even if the vendors intended to defraud their creditors, appellant is not affected by it, unless it participated in the fraudulent intent. Appellant had a right to protect its debt by purchasing goods in excess of its debt, if necessary. 64 Ark. 184; 56 Ark. 417–418; 60 Ark. 425; 61 Ark. 454–455; 41 Ark. 325; 42 Ark. 525. It was error to admit evidence of the acts of Page occurring after the making of the sale to appellant, and tending to show that he had a fraudulent intent in making same. 54 Ark. 129; 18 Ark. 124; 18 Ark. 172.

*John M. Moore* and *W. B. Smith*, for appellee.

The judgment of the court below on the attachment is conclusive of fraud, since it was not excepted to and appealed from. The presumption is in favor of the correctness of the findings of the court below as to facts. 57 Ark. 486; 53 Ark. 329. The appellant is chargeable with notice of the fraudulent intent of the vendor, because its agents, Sutton and Young, were apprised of it, and acted in view of it. 60 Ark. 423. The evidence of fraud warranted the court's finding. 42 Ark. 526; 22 Ark. 184. The evidence of the subsequent acts of Page was competent, because it was admissible in the trial of the attachment suit; and since the issues were submitted together, the evidence was indivisible. 54 Fed. 296; *ib.* 867; 60 Ark. 424; 59 Ark. 305. Counsel for appellant have misapprehended the meaning of the decision in 64 Ark. 184. If a creditor buys in his debtor's stock, paying him in cash the amount of the excess over his debt, knowing, or having reason to know, of his intent to defraud his other creditors, that creditor is held to be a party to the fraud of the debtor. 40 Mo. App. 128; 39 W. Va. 644; 25 Ill. App. 457; 22 Neb. 797–813; 80 Ala. 140. The same rule applies to the purchase, whether or not part of the price paid is set off by an antecedent debt. 74 Ala. 171; 82 *ib.* 177; 93 *ib.* 67; 84 Tex. 668–673; 70 Tex. 49; 82 Mo. 518.

*Ratcliffe & Fletcher*, in reply.

The record shows that appellant saved exceptions to the findings of the court in the attachment suit. Even were this not true, the issues are separate and distinct, and the findings in one are not conclusive in the other. If Sutton undertook to act as agent for both parties at the same time, his agency for appellant ceased, and appellant is not bound by his subsequent acts and knowledge. Mechem, Agency, §§ 66 and 723.

RIDDICK, J., (after stating the facts.) This is a controversy concerning the ownership of a stock of goods. The goods were owned by W. L. Page & Co., who sold them to the appellant, the Carl & Tobey Company. The appellee, the Beal & Fletcher Grocer Company, afterwards attached the goods to

satisfy a debt held by them against said W. L. Page & Co., and said appellee contends that the sale to the appellant was fraudulent and void. The question to be determined is whether the evidence is sufficient to support the finding of the circuit court to the effect that the sale was made by Page & Co. with the intent to hinder and delay their creditors, and that the appellant company had notice of such fact at the time it purchased.

On the first point, we are of the opinion that the evidence was amply sufficient to sustain the finding that the object of Page & Company in making this sale was to place their assets beyond the reach of their other mercantile creditors. Page, who was the business manager of the firm, received from the appellant company, over and above its debt, about $1,100 in cash as purchase price for the goods. In addition to this, the firm had in bank $186, which Page withdrew immediately after the sale of his stock of goods; being, as he said, afraid that the Oliver-Finnie Grocer Co., a firm creditor, "would garnishee the bank." Of these sums of money, amounting to about $1,300, which he had belonging to the firm, he paid to Mrs. Chapman, a sister-in-law, $557 for money which he claimed to have borrowed from her. He paid $150 to Mrs. Baldwin, also a sister-in-law, and his co-partner in the business of W. L. Page & Co. $500 he paid to his wife, and the remainder he used for family expenses of himself and Baldwin. An attorney for one of the firm's creditors went to Page soon after the sale was consummated, and asked him to pay his client's debt out of the money he had received for the stock of goods. But he replied that he could not do it, that "the money was in his pocket, and was going to stay there."

It is true that Page testified that he paid the $500 to his wife for services rendered by her as book-keeper of the firm, but the statement that the firm owed his wife is, we think, open to grave suspicion. Baldwin, the husband of a member of the firm of W. L. Page & Co., and who managed his wife's interest in the firm, testified that never, until the day of the trial, had he heard that Mrs. Page was to be paid for keeping books. These and other facts not necessary to discuss convince

us that the judgment of the circuit court sustaining the attachment was in accordance with the evidence.

Did the appellant company have notice of this fraudulent intent on the part of Page & Co.? or, what would amount to the same thing, did their attorney and agent have notice of such intent, or of facts sufficient to put him upon inquiry? On that point the evidence is more doubtful. But the attorney of appellant had held this claim against Page & Co. for some weeks, and he knew that they were refusing to pay unless he would purchase the entire stock of goods, and pay the balance above his client's claim in cash. He knew, also, that another creditor had commenced suit against the firm. These facts would indicate that this firm was in an embarrassed financial condition. It is plain that the attorney knew this; for, after having made several propositions to the defendant firm looking to a settlement of his client's debt, among which was an offer to purchase from Page & Co. enough goods to settle the debt of his client, and after all of his propositions had been rejected, he wrote to his client that the only way to collect their debt was to purchase the stock of goods from Page & Co. upon the terms proposed by them. "He reported to us," says Mr. Tobey, "that the only thing that could be done to get our money was to buy defendants' stock." This report of the attorney, and the action of the appellant in purchasing a stock of goods that they did not want, indicate that it and its attorney knew that Page & Co. had little, if any, property besides this stock of goods, and that when that was gone there would be nothing further from which creditors could realize their debts.

It is said that the attorney had no notice that there were other debts. But he had actual notice of one other debt, and knew that an action had been commenced to collect the same. Besides, the defendants were merchants, and it is rare that a merchant becomes embarrassed without having more than two creditors. This is a matter of such common notoriety that we must presume that appellant and its attorney had notice of it. The facts and circumstances, we think, were sufficient to put appellant and its attorney upon inquiry. Here was a firm, having no visible assets except a stock of goods, unable or

unwilling to pay a past-due debt to appellant. Another creditor commenced suit, and then the firm proposed to pay appellant's debt of $547, but only on condition that appellant will buy the entire stock, and pay the balance of the purchase price, amounting to over a thousand dollars, in cash, thus placing all the firm's property beyond the reach of creditors. The circumstances, we think, were sufficient to have awakened the suspicion of a man of ordinary prudence, and to have caused an inquiry. But the attorney of appellant made no inquiry. Had he sought for information, he could doubtless have learned that the firm of Page & Company owed other debts, and in fact was insolvent, and that their object in refusing to sell a portion of the goods in payment of appellant's debt was to force appellant to purchase the whole stock, so that they could place the balance of the purchase price beyond the reach of creditors. A consideration of the evidence convinces us that the finding of the circuit court that appellant had notice of the fraudulent intent of Page & Company has evidence to support it.

After having such notice, did the appellant company have the right to purchase a stock of goods three times the value of it own debt, and pay the balance in cash?

Insolvency does not, of itself, prevent the debtor from controlling and selling his property; and it is undoubtedly true that a creditor may purchase property of his insolvent debtor in satisfaction of his debt, if the price paid be fair and adequate, and no benefit is reserved to the debtor. But he cannot go further, and, under pretense of collecting his own debt, aid the debtor in his effort to hinder and delay his other creditors. If, having notice of his debtor's dishonest purpose, he purchases property largely in excess of his own demand, paying therefor in cash, when the nature of the property does not make it necessary that he should purchase more than the amount of his own claim, the law will not uphold the transaction. To do so would be to furnish dishonest debtors with an easy method of placing their property beyond the reach of creditors. Under pretense of paying one creditor, they could convert their assets into cash, and place themselves in a position to perpetrate a fraud upon all other creditors. *Wood* v. *Keith,*

60 Ark. 425; *Levy* v. *Williams*, 79 Ala. 171; *Carter* v. *Coleman*, 82 Ala. 177; *Harris* v. *Russell*, 93 Ala. 67; *Oppenheimer* v. *Halff*, 68 Tex. 409; *Hart* v. *Sandy*, 39 W. Va. 644.

There is no pretense here that there was anything in the nature and character of this property which made it necessary to sell the whole to avoid injury. On the contrary, the only reason given for the purchase of the entire stock of goods is that the debtor desired to convert the whole stock into cash, and refused to sell less than the whole stock. This persistency of the debtor, without a legitimate reason, in a refusal to sell unless the creditor would take all his goods, and pay the excess in cash, did not justify the creditor in purchasing, but should have convinced him that the purpose of the debtor was dishonest; that, under pretense of paying one creditor, he intended to put his assets beyond the reach of all other creditors.

We think counsel for appellant have misapprehended the meaning of the opinion delivered by this court in the case of *Fly* v. *Screeton*, *ante*, p. 184. The judgment of reversal in that case was clearly right, for the reason that the presiding judge instructed the jury, as a matter of law, that a purchase of goods from an insolvent debtor at fifty cents on the dollar of the invoice price was "conclusive of fraud," whereas, by reason of the damaged condition of the goods, or change in the market price, the actual value of such goods may have been even less than the price named. It being necessary to remand the case for a new trial, the court laid down the rule that a creditor, having notice of the fraudulent intent of the debtor, may nevertheless, when acting in good faith, purchase more property than sufficient to satisfy his own debt, and pay the balance to the debtor, when, on account of the nature of the property, it is necessary to do so, as when the sale of a lesser quantity to pay the debt could not be made without material injury to the portion remaining unsold. It will be noticed that the court did not decide that the sale of more goods than sufficient to satisfy the debt was necessary in that case, but remanded the case in order that the matter should be determined as a question of fact.

But in this case the circuit court has already determined that the purchase of such excess above the appellant's debt was unnecessary, and the finding is supported by the evidence.

We do not therefore think that *Fly* v. *Screeton* is in conflict with our decision here.

We do not find, and it is not necessary to find, that either the appellant company, or its attorney, did anything more than they deemed necessary to protect their own debt. They doubtless felt that they were dealing with an unprincipled man, and that if they refused to accede to his demands, there would be great risk of losing the debt. But a necessity arising solely from the unscrupulous character of the debtor is not sufficient in law to justify the creditor in aiding him to convert his property into money, to the injury of the other creditors. *Levy* v. *Williams*, 79 Ala. 171.

The circuit court admitted evidence of certain acts of Page, occurring after the sale of the goods, which tended to show a fraudulent intent on his part in making such sale. It is contended that it was error to admit such evidence against appellant, but, while this might be true had the issue upon the interplea been tried separately from the attachment issue, yet the point is not well taken here, for both issues were, by consent, tried together. As the evidence was competent against the defendant firm to sustain the attachment, it was not error to admit it. On the whole case, finding no error, the judgment is affirmed.