M. ROSENHEIM & SON, Appellants, v. FLANDERS SISTERS, N. M. FLANDERS, ELLA FLANDERS AND J. W. FLANDERS.

**Fraudulent Conveyances :** EVIDENCE ESTABLISHES. Defendant was engaged in the millinery business in partnership with her sister, and she also conducted a like business individually in another city. Attachments were levied on the firm stock and defendant immediately executed a bill of sale of her stock to her brother for the express consideration of $2,500, and telegraphed him what she had done. There had been no previous correspondence as to such sale, but he at once started for the place where the store was and took possession of the stock She was indebted to him on a note for $900 which he turned over to her. He gave her $400 in cash, and the balance was made up by his notes. The transfer of the cash was made in the presence of a third party, because the brother, as he stated, wanted a witness. On taking possession of the store, he posted signs therein to the effect that the store belonged to him. No invoice was made of the stock. The brother had never seen it before, and he knew nothing of the millinery business, his occupation being that of a common laborer, but he testified that some months previously he had endeavored to buy the stock. *Held*, the conveyance to him was void.

*Appeal from Wapello District Court.*—HON. F. W. EICHELBERGER, Judge.

MONDAY, MAY 27, 1901.

PLAINTIFF firm, being a creditor of Flanders Sisters, a co-partnership composed of N. M. and Ella Flanders, brought suit upon its claim, and sued out a writ of attachment, which was levied upon a stock of millinery goods in Ottumwa. Later the present action in equity was brought in aid of such attachment; it being alleged that defendant J. W. Flanders claimed to be the owner of said goods, but that the sale to him was fraudulent, and for that reason void as against plaintiffs. It was further alleged that the property attached consisted of a stock of millinery, which would greatly depreciate if retained long. A receiver was therefore asked, to take charge of and sell the same. A receiver was duly appointed. In due time trial was had in equity, and a decree rendered finding J. W. Flanders to be the lawful owner of the property in question, and ordering the receiver, who had sold the property, to turn over the proceeds to him. Plaintiff firm appeals.—*Reversed.*

*McElroy & McElroy* for appellant.

*Steck & Smith* for appellees.

WATERMAN, J.—Flanders Sisters were engaged in the millinery business at Peoria, Ill., and the defendant N. M. Flanders had the stock in question at Ottumwa, where she was doing business on her individual account. Being pressed by creditors, the Peoria stock was sold to an employe, and a bill of sale of the Ottumwa stock was made by N. M. Flanders to her brother, J. W. Flanders' for a purported consideration of $2,500, which was paid in a manner we shall have occasion to relate hereafter. On the day following the delivery of this bill of sale, and after J. W. Flanders had taken possession of the property, plaintiff firm attached. Two questions are presented by the facts for solution: (1) Was the sale by N. M. Flanders to her brother made with intent

to hinder, delay, or defraud plaintiffs? (2) If there was fraud on the part of N. M. Flanders, what was the relation of J. W. Flanders to the transaction? Was he a creditor seeking merely to secure his claim, or was he in the nature of a purchaser endeavoring to make a profit out of the property?

If the sale was made by N. M. Flanders with intent to hinder and delay plaintiffs, it was fraudulent on her part, and could be avoided against any purchaser from her, even though he paid full value, if such purchaser bought with notice, either actual or constructive, of the grantor's intent. *Steele v. Ward*, 25 Iowa, 535; *Kellogg v. Aherin*, 48 Iowa, 299; *Preston v. Turner*, 36 Iowa, 671; *Bixby v. Carskaddon*, 55 Iowa, 533; *Kelley v. Flory*, 84 Iowa, 671. The grantee in such a case will be held to have constructive notice of the grantor's intent when he knows of such facts as would put a man of ordinary prudence upon inquiry which, if pursued, would lead to a knowledge of the grantor's purpose. *Jones v. Hetherington*, 45 Iowa, 681; *Williamson v. Wachenheim*, 58 Iowa, 277; *Spaulding v. Adams*, 63 Iowa, 437; *Lyons v. Hamilton*, 69 Iowa, 47. This is the rule with regard to a purchaser, but it does not apply to a creditor seeking security for his claim. A creditor acting in good faith may take security from his debtor, even though he knows there are other creditors, and that the effect of the debtor's action will be to defeat them. *Carson v. Byers*, 67 Iowa, 606; *Crawford v. Nolan*, 70 Iowa, 97. He is even protected in such case although he knows the debtor is prompted by a fraudulent intent. *Chase v. Walters*, 28 Iowa, 460; *Aultman v. Heiney*, 59 Iowa, 654; *Stroff v. Swafford*, 81 Iowa, 695. He may lawfully take a conveyance that secures debts due to others as well as to himself. *Gould v. Hurto*, 61 Iowa, 45; *Roberts v. Press*, 97 Iowa, 475. But the creditor must act in good faith; for, if he takes the conveyance for the purpose of aiding in the fraud, it is void. *Richards v. Schreiber, Conchar & Westphal Co.*, 98 Iowa, 422. Or if, in seeking to secure

his debt, he goes father, and combines the character of a volunteer purchaser with that of a creditor (that is, if he buys and pays partly with his debt and partly in cash, there being no necessity for his so doing in order to secure his claim), he is to be treated merely as a purchaser, and the rules above given relating to a purchaser must be applied to him. *Levy v. Williams,* 79 Ala. 171; *Leinkauff v. Frenkle,* 80 Ala. 136; *Carl & Tobey Co. v. Beal & Fletcher Grocer Co.,* 64 Ark. 373 (42 S. W. Rep. 664); *Oppenheimer v. Guckenheimer,* 39 Fla. 617 (23 South. Rep. 9); *McDonald v. Gaunt,* 30 Kan. 693 (2 Pac. Rep. 871); *Young v. Stallings,* 5 B. Mon. 367; *McVeagh v. Baxter,* 82 Mo. 518; *Black v. Vaughan,* 70 Tex. 47 (7 S. W. Rep. 604); *Dorrance v. Mc-Alester,* 1 Ind. T. 473 (45 S. W. Rep. 141). There is one exception to this last rule, where by agreement the purchaser applies the cash in payment of other indebtedness of the grantor the sale otherwise being fair. *Rankin v. Vaudiver,* 78 Ala. 562; *Ferguson v. Hall,* 99 Ala. 209 (13 South. Rep. 302). But this exception, for reasons that will appear, does not apply in this case.

Having settled the legal principles governing transactions of this kind, we shall now take up the evidence, and ascertain what particular rule is to be applied to the parties here. The facts that we shall present are taken wholly from the testimony of N. M. Flanders and J. W. Flanders. Plaintiffs' claim of over $1,200 was for goods sold. The purchase was made by N. M. Flanders; about $800 worth being for the Peoria concern, and the remainder for the Ottumwa store. The goods were bought in September, 1896, and by agreement the bills were to be dated October 15, 1896, with a credit of 30 and 60 days. About the eleventh or twelfth of October, 1896, the stock in the Peoria store was attached by creditors. N. M. Flanders was there at the time. Just before the attachment was levied, she, with her sister, made a bill of sale of the stock to the woman who did the trimming for them, and whose pay was in arrears some four or five

weeks. The witness (N. M. Flanders) cannot say how much was due to this person; nor can she tell the indebtedness of the store, or give the value of the stock, although she says it would have been worth to her about $3,500. Afterwards in her testimony this witness says the sale of Peoria stock was made to this employe in consideration of wages due, and also that she should pay the indebtedness of the concern. In fact, Rosenthal & Co., who were the attaching creditors, got all. While still in Peoria, N. M. Flanders executed a bill of sale, dated October 9th, of the stock at Ottumwa, to her brother J. W. Flanders, who resided and then was at Kansas City, Mo. This she sent by mail to Ottumwa on the day the attachment was levied in Peoria, immediately telegraphing her brother what she had done. There had been no previous correspondence between these parties about such a sale. The message evidently called the brother at once to Ottumwa. In response he took the first train for that city, arriving on the morning of the thirteenth, at 6:15 o'clock. He was met at the station by N. M. Flanders. As soon as the postoffice opened, he obtained the bill of sale, and then brother and sister went to a hotel to complete the transaction. The consideration of $2,500 was paid in this manner: J. W. Flanders held his sister's note for a balance of about $900, borrowed money. He turned this over, paid a bill for rent $76.40, $400 cash, and gave his notes for the remainder. The defendants do not agree in their statements as to what was paid. N. M. Flanders fixes her indebtedness to her brother at $900. He claims $1,200. She says he gave her his notes for about $628; he says, for $904 and some cents. But for our purpose it is enough to say that the consideration, such as it was, was adequate in amount. These notes of J. W. Flanders were afterwards turned over by N. M. Flanders to certain of her creditors, but plaintiffs and some others received nothing. The $400 cash, so far as appears, was retained by N. M. Flanders for her own benefit. It is not shown that there was any agreement between these parties that the notes

were to be transferred to creditors. The disposition of this stock left N. M. Flanders wholly without property, and burdened with debts which she could not hope to pay; for, according to her own statement, she had been singularly unfortunate in business. It is true, there is an attempt to show that she owned a house and two lots in Kansas City. But this attempt is an utter failure, considered as an effort to prove solvency. Its only effect seems to be to discredit the testimony of the debtor. Although she claims to have owned this property for some time, she cannot give its location, street, or number, nor does she know in whom the title rests. Her brother seeks to help her out; tells where the property is situated; says title is in his mother, who holds it for his sisters; that there is a $700 mortgage on it; that it ought to bring $2,000, but he does not know what it is worth, as it is almost impossible to get cash for property. We have no difficulty in reaching the conclusion that N. M. Flanders was insolvent when this bill of sale was made. There are some other important facts which we shall consider in connection with the question of J. W. Flanders' motive, intent, and knowledge. It is sufficiently shown, already, we think, that N. M. Flanders intended by this transaction to defraud plaintiffs. To say otherwise would be equivalent to holding that fraud cannot be established by circumstantial evidence, and this would amount to a holding that it cannot, in any except the rarest of cases, be established at all. It is seldom, if ever, susceptible of proof by direct or positive testimony. We need not comment on this evidence. It carries its interpretation fairly upon its face. Every act of N. M. Flanders, considered in the light of surrounding circumstances, is consistent only with the conclusion that she sought to put her property out of her hands to defeat anticipated attachments. We shall proceed with the evidence relating especially to J. W. Flanders' part in the transaction. He says that some months before this, when N. M. Flanders was at home, in Kansas City, he sought to buy out her business in Ottumwa,

but she refused to sell. He had worked in a hide and wool store at one time, and latterly was engaged in handling lumber, driving a team, and doing the work of a common laborer. He knew nothing of the millinery business, and had never been in Ottumwa until he came on October 13th in response to his sister's telegram. Why he should wish to go into this business in which his sister, who understood it, was losing money, he does not explain. Unexpectedly he receives notice that the bill of sale had been made to him for $2,500, and he goes prepared to take it. There was no invoice made of the stock; no investigation of the accounts to ascertain what, if any indebtedness was against it. There was not even an inspection of the goods bought; for, if the parties went to the store at all before the purchase was completed, they stayed but a few moments. The fact is that no time was to be lost, if attachments were to be defeated. The payment for the stock was made in the hotel office. After counting the $400 cash, J. W. Flanders had the clerk of the hotel count it also, in order to have, as he says, a witness to its payment, though materials were present for preparing a receipt. He was taking the stock of $2,500 on the implied assurance of his sister that it was worth that sum, for there is no evidence that she ever told him its value, but in this $400 transaction with her he needed a witness. Is it not a fair—yes, the only conclusion that this witness was wanted, not against his sister, but against the creditors, who were expected soon to put in an appearance? Immediately after breakfast the purchaser took possession of the store, and his first act was to write three notices, as follows, "This stock of goods belongs to J. W. Flanders," and post them in different places inside the room. What reason was there for this unusual proceeding, except to give notice to creditors? It is true, Flanders says he was advised to do this by the landlord; but why act on such strange advice, if he had no reason to think there were other claims against the stock? It is taxing credulity to ask one to believe, in the face of these ad-

mitted facts, that J. W. Flanders purchased this stock in good faith. Under the rules of law we have given, he must be treated as a purchaser, and held to have notice of such facts as a prudent man, under the circumstances, ought to and would have discovered. Any prudent man would have been put on inquiry by the facts which this purchaser knew, and any inquiry—even the slightest—would have disclosed the grantor's unlawful purpose. We go further, however. Treating J. W. Flanders in this transaction, as a creditor simply, and we think the testimony clearly shows that he sought, under pretense of securing his claim, to aid his sister in hindering, delaying, and defeating plaintiffs. The sale to him must therefore be held fraudulent and void, and the receiver should be ordered to pay over the proceeds in his hands to plaintiffs to the extent of their claim, with interest, after deducting the sum for expenses and receiver's fees allowed by the trial court; for, having participated in the fraud, J. W. Flanders is not entitled to protection, even to the amount of the indebtedness due him. *Wilson v. Horr*, 15 Iowa, 489; *Chapman v. Ransom*, 44 Iowa, 377.—REVERSED.