CHARLES STEINFORT, Appellee, v. SAMUEL LANGHOUT et al., Appellants.

**FRAUDULENT CONVEYANCE:** Creditor Taking Conveyance—
1 **Good Faith Demanded.** A creditor of an insolvent debtor may, if he acts in good faith, that is, *solely to protect himself*, take a conveyance from such debtor, even though he has full knowledge that the debtor is giving the conveyance in order to defeat some other creditor. But such good faith is the full limit of his right. He must remember that the law strikes hard at a fraudulent state of mind. If, while protecting himself by taking the conveyance, he intermingles the motive and intent to assist the debtor in his scheme to defeat the other creditor, he will find himself stripped of the protection which the law otherwise would accord to him.

**FRAUDULENT CONVEYANCE:** Adequate Consideration—Effect
2 **When Fraud Shown.** The fullest and most adequate consideration paid will not save a conveyance from being declared fraudulent when made with the intent, on the part of both grantor and grantee, to defeat the creditors of grantor. Fraud poisons and taints every transaction.

PRINCIPLE APPLIED: A father took a conveyance from his son covering all the property owned by the son except household effects. At the time, there was pending a motion for a new trial in a cause wherein a verdict for $1,000 had been returned against the son. The son owed the father a bona fide debt of $1,500, and $1,440 to other parties. The father took the conveyance in full payment of his claim and executed his personal notes to the son's creditors to the amount of $1,440. The $2,940 was the full value of the property. The conveyance, as shown by the evidence, was made for the purpose, on the part of both father and son, of defeating the collection of the judgment. *Held*, fraudulent and void, even though the consideration was adequate.

*Appeal from Sioux District Court.*—HON. WM. D. BOIES, Judge.

MONDAY, MAY 17, 1915.

ACTION to set aside a sale of personal property on the grounds that it was made for the purpose of hindering, delaying and defrauding creditors. Decree for the plaintiff. Defendants appeal. *Affirmed.*

*Geo. T. Hatley,* for appellee.

*Van Oosterhout & Hospers* and *Gerrit Klay,* for appellant.

GAYNOR, J.—This action is brought in equity to set aside a certain bill of sale executed by the defendant, Samuel Langhout, to Henry Langhout on the 3d day of October, 1912.

Samuel Langhout is a son of Henry Langhout, and, at the time of the making of the bill of sale, resided on a farm owned by his father, Henry. The property covered by the bill of sale was, at the time of its execution, in the possession of Samuel Langhout, and consisted of horses, colts, cows, calves, shoats, chickens, farm machinery, buggies and wagons, three sets of harness and about sixty acres of corn in the field. The facts and circumstances attending and leading up to the making of this bill of sale will be hereafter referred to in detail.

1. FRAUDULENT CONVEYANCES: creditor taking conveyance: good faith demanded.

The plaintiff's right to maintain this action is based upon the fact that on the 11th day of November, 1912, he obtained a judgment in the district court of Sioux County, against the defendant, Samuel Langhout, for $1,000.00 with costs; that on that date an execution was issued against Samuel Langhout, and was returned by the sheriff with the words endorsed thereon, "No property found." Thereafter, and on the 16th day of November, 1912, an order was issued by the judge of the district court, upon proper showing, requiring the defendants, Samuel and Henry Langhout to

appear for examination in proceedings supplemental to execution.

They appeared before the court and were examined and their answers at that hearing made a part of this record. The trial court found for the plaintiff, finding that the bill of sale was fraudulently made, and for the purpose of hindering and delaying the creditors of Samuel Langhout, and especially this plaintiff, and subjected the property so conveyed in the bill of sale, in the hands of Henry Langhout, to the payment of plaintiff's judgment. Defendants appeal.

This is a fact case. There can be and is no serious controversy as to the law that governs the rights of the parties in a controversy of this kind.

The action in which the judgment against Samuel Langhout for $1,000.00 was entered was tried at the September term, 1912. On the 13th day of September, the jury returned their verdict. Thirty days were given to the defendant in which to file a motion for a new trial. No motion for a new trial was filed until the 8th day of November, 1912. On the 11th day of November, the motion was stricken from the files and judgment entered against the defendant, Samuel Langhout, for $1,000.00, with six per cent interest from the 13th day of September, 1912, and costs amounting to $120.85.

It was during these thirty days given by the court to the defendant for the filing of a motion for a new trial that the bill of sale was executed. It appears that the bill of sale covered all the property owned by Samuel Langhout, except his household goods and furniture.

At the time of the execution of the bill of sale, the record shows that Samuel was indebted to his father on a note of $700.00, with interest, amounting to $722.00. This note was secured by mortgage. He was also indebted to him in the sum of $800.00 for rent due on the place then occupied by Samuel. This was all that was due Henry from Samuel at the time of the making of the bill of sale. The consideration in the bill of sale was fixed at $2,940.00. The

balance was paid in this way—Samuel was indebted as follows: to his sister, Agnes Langhout, $600.00 on a note dated February 25, 1910, due February 25, 1911, bearing 8% interest; to his brother, David Langhout, $400.00 on a note dated January 28, 1912, and due October 28, 1912, bearing 8% interest; to Frank Dykstra, his brother-in-law, $250.00 on a note dated May 10, 1912, due May 10, 1913, bearing 8% interest, and to his attorney, Gerrit Klay, in the sum of $50.00.

At the time of the making of the bill of sale, these obligations were disposed of by Henry in this way: Henry receipted to Samuel for the amounts due to himself, took up the obligation due Agnes Langhout by executing to her his personal note, dated October 12, 1912, for $720.67, due October 1, 1913, bearing 8% interest; took up the note due David Langhout by executing to him a note for $400.00 dated October 3, 1912, with 8% interest from February 28, 1912; took up the note due Frank Dykstra by executing to him a note for $257.78, dated October 1, 1912, and due October 1, 1913. The $800.00 obligation for rent was disposed of by executing the following receipt to Samuel:

$800.00                         Orange City, Oct. 3, 1912.

Received of Samuel Langhout $800.00, being rent for 1912 on Northwest Quarter 32-97-45.

Samuel Langhout testified that these notes were fixed up in the attorney's office. "Mr. Klay and my father and my brother David were present. This was the time we drew the bill of sale."

David testified that, at the time the bill of sale was drawn up, he had with him his note against Samuel and also his sister's note; that the father took up these two notes and delivered to him his personal notes, payable one to himself, and one to Agnes, for the amount of their several notes. "My sister gave me her note for collection. I took father's note in lieu of her note and delivered father's note to her

about a week later at Sioux City, and about two weeks later I bought the note from my sister. My sister was going away and had to have the money. I accepted the new note that my father gave me in lieu of the one I held against Samuel. I also accepted a new note, signed by my father, in lieu of the old note which my sister had against Samuel. I appraised the property before the bill of sale was made. My father asked me to appraise it. He phoned me from Orange City. He said he wanted to find out what it was worth. This was some time before the bill of sale was made. When he phoned me to come and appraise it, I supposed he wanted to buy the stuff. I found that the bill of sale was to be made on the 3d day of October, the day it was given. I just happened to be up there.''

There is some further testimony from David to the effect that he intended to press the collection of the note, had it not been adjusted in this way.

Frank Dykstra testified that he was not at Orange City at the time the bill of sale was made; that he had no talk with Henry Langhout as to how the note should be changed. He told Samuel he wanted it paid when he heard of the verdict. It was after the bill of sale had been made that Henry handed him the new note, and said that he took up the old one. This was about a week or two after the bill of sale was made.

He further testified that the first thing he knew about Henry's giving a note to him in lieu of the note he had against Samuel was when Henry phoned him to send the old note. It was then that he found out he had taken it over; that he did not tell him when he phoned what he was going to do. It was a couple of days before the bill of sale was made that he telephoned for the old note; that he had heard something about giving a bill of sale, and that the making of the new note and the taking up of the old note was done without his knowledge; that he had the old note in his possession at the time the bill of sale was given and did not

know that his father had executed a new note in his favor, until he delivered it to him about a week or so after the bill of sale was made.

The above facts indicate the manner in which the deal was begun and consummated, which resulted in the giving of this bill of sale to Henry on the 3d day of October, 1912, transferring to him substantially all the property of Samuel.

On the question of the knowledge and intent of the parties in entering into this deal and consummating it in the way they did, the record discloses that in the proceedings supplemental to execution, Henry Langhout testified: ''I took a bill of sale of everything my son owned except his household goods. I let him keep them. All this property described in the bill of sale is now on my farm at Perkins, the same place it was before the bill of sale. I left it in my son's possession.''

He was asked touching his reasons for giving the bill of sale and he stated:

Q. ''Why did you take this bill of sale?''
A. ''Well I told you, the boy came over to my house and says, 'Father, you got a mortgage on my goods for $700.00, and you have $800.00 rent coming and you know I am sick.' And he says, 'I have got a little debt, and the first year I had no crop and last year nearly no crop on account of so dry, so I am in debt. You know I had of my sister $600.00 to buy furniture and some tools,' and he says, 'I owe another girl for labor and for the buggy, and I can't work by the day because I am sickly and I can't pay the people, so wouldn't you buy the business out and pay the bills and pay my notes?' So I said, 'That is all I can do.' So I told my son to come and appraise the cattle and told Robyn if he would appraise the horses and appraise them honest so as to get the value of the goods.''
Q. ''When did he come to you and tell you this?''
A. ''The day we made the bill of sale. He told me a

little before and he came afterwards and made the bill of sale; a few days before we made the bill of sale.''

Q. ''You say it was a few days before you took the bill of sale that he suggested you buy him out?''

A. ''Sure.''

Q. ''How many days before?''

A. ''I hardly know particularly. He came on account his health was bad.''

Q. ''Just answer my questions, please.''

A. ''Yes sir, I will.''

Q. ''I am not doubting your word at all, I just want to see what arrangements you had with him. How many days after he spoke to you did he see you about this?''

A. ''I could not particularly tell.''

Q. ''It was only a few days?''

A. ''Yes, it was not long.''

Q. ''Did you go out there or did he come to Orange City?''

A. ''They had to go out there first, out there to see the stock.

Q. ''Where was the bill of sale drawn?''

A. ''Right here in Orange City.''

Q. ''Who drew it?''

A. ''Mr. Klay.''

Q. ''You say you had a mortgage against your son?''

A. ''Yes sir.''

Q. ''Have you that mortgage here?''

A. ''No, sir; I have not I think.''

Q. ''You were not afraid that Sam was going to run away, were you?''

A. ''No, I am not afraid of that. Sam is an honest boy.''

Q. ''You did not buy out because you were afraid he would run away?''

A. ''No sir.''

Q. ''That he would not pay you?''

A. "I was afraid he was not able to."

Q. "His sister was not bothering him for money, was she, or was she?"

A. "The note was quite overdue."

Q. "But she was not bothering him?"

A. "No, but she took a homestead in Colorado and told me she needed the money. When I paid my daughter, she gave back Samuel's note. I gave her another note. I told her I did not have the money then. I think this note ran six months. She said she needed the money in six months, something like that. I gave the note she gave me to Sam."

He further testified: "If I had not taken the bill of sale and no new trial had been granted, the children would probably have taken Sam's property. They sue him, and maybe sold the business and make trouble. The sheriff would probably have sold Sam's property, I don't know."

Q. "You didn't want that done, did you?"

A. "I wanted him to pay his debts. I didn't want the sheriff to sell the property if I could honestly help it. I was going to keep him from doing it if there was any honest way to do that. I figured out this was the best way to do. I figured out that I should buy the stuff and pay Sam's debts, what I could reach of them."

Q. "You knew that the sheriff would sell Sam's property?"

A. "I did not know. I didn't say that, but I say I thought I buy honest and square and pay his debts if I could, and told him not to hide anything and pay up his honest debts."

Q. "You don't think this judgment of $1,000.00 was an honest debt?"

A. "I don't say that. That isn't my business. If you had it against me I might say yes or no."

He further testified: "I could not go to the Supreme Court with Sam's case because I have no money, so I bought the property and paid his debts so far as I could. I told

him I had better buy him out and then he could work for me. He was to work for me one year at $50.00 per month. If I had not taken the bill of sale I suppose the sheriff would have sold Sam's property. I did not want that done if I could help it."

Samuel Langhout at the same hearing testified: "I gave the bill of sale on the 3d day of October, 1912."

Q. "What did you do that for?"

A. "Because I was afraid in this case that if I left it run they would sell me out, and I would be out of an occupation as I am not very strong and cannot do a day's work, and never done anything but farm, so I was afraid in that case I would be turned out of house and home, and I have a wife and two children I have to support, and I thought it was my duty to look after them. I knew if I took the case to the Supreme Court it would take a good deal of money and as long as I don't have anything, I thought it would be better to fix it this way, and I would be able to work for father, and have an income so that I could support my wife and children."

He was asked this question: "You knew if you didn't sell to your father, the sheriff would jump on to it?"

A. "Yes, I knew that, and it would put me out of occupation."

Q. "And in order to keep the sheriff from doing that you deeded it to your father?"

A. "Yes, sir. I knew if the thing went ahead and I got no new trial that the sheriff would get the property. I had several small children at the time and I owed my father $1,500.00 and I owed my sister, my brother and my brother-in-law."

The note held by the father against Samuel, heretofore referred to, was not due until August 12, 1915.

This is all the testimony material to a full understanding of the situation and the mental attitude of these parties

towards the transaction, and the intent and purpose they had in view in making the bill of sale. The time, the place, the circumstances, the conditions, what was done, and the apparent necessity for quick action, and the motive that prompted them to take action, the purpose to be accomplished by their action, are all made apparent.

The note held by the father against Samuel was not due. It had almost three years to run. The rent was for the year 1912. We are not inclined to believe that the brother, the sister or the brother-in-law were urging payment at that time. We are satisfied that this transaction would never have taken place had it not been for the fact that Samuel and his father thought best, in the interest of Samuel, that the property be placed beyond the reach of an execution in favor of the plaintiff herein; that the purpose and object of making the bill of sale was to place the property beyond the reach of an execution in the event that a judgment should be entered in the plaintiff's case and execution issue thereon.

. There is no claim of exemption made by either party, and no evidence as to what, if any, property conveyed was in fact exempt. The only defense urged by the defendant Samuel is that his father paid the full market value of the property; that while he knew, at the time the bill of sale was executed and the property sold, it would have the effect of postponing the collection of plaintiff's judgment and prevent the immediate collection thereof, he had no intention, at any time, to hinder, delay or defraud the plaintiff in any manner; that he simply sold it in good faith, upon advice of counsel, and in an honest belief he had a right to so do in payment of valid existing debts.

The only affirmative defense pleaded on the part of Henry is that he purchased the property in good faith for the full market value and without any knowledge, on his part, of any intention on the part of Samuel to delay, hinder, or defraud his creditors, and that this defendant had no such intention. While he knew Samuel to be insolvent at the

time, and that the effect of the sale would be to prevent immediate collection of plaintiff's judgment, he purchased the property honestly, in good faith, and under the belief that it was not inconsistent with the laws of the state. This presents the real issue.

The appellant's first contention is that fraud is never presumed; that the burden of proof is on a creditor who seeks to set aside a transaction of his debtor as fraudulent to prove that the sale was made with a fraudulent intent; that is, that it was made with the intent to hinder, delay or defraud creditors. This contention is true, and needs no citation of authorities to support it.

The second contention is that the plaintiff wholly failed to prove fraud in the transaction, and therefore has not satisfied the burden of proof which the law places upon him. This is a question of fact and not of law, and must be determined from the record hereinbefore set out.

The third contention is that mere suspicion of fraud is not enough, in itself, to justify the setting aside of a conveyance, where the conveyance is supported by an adequate consideration. This also is true. Fraud is never presumed, but the existence of it must be established affirmatively by the one who charges it. If the evidence creates only a suspicion as to the existence of the fraud, it is insufficient to justify a finding of the existence of fraud in fact. See *Stewart Bros. v. Mills County Bank,* 76 Iowa 571; *Smith v. Mack,* 94 Iowa 539.

The fourth contention is that fraud is not presumed from the mere fact of family relationship between the parties to a transaction. This is also true. See *Mahaska County v. Whitsel,* 133 Iowa 335.

The fifth contention is that the fraudulent intent of both grantor and grantee, vendor and vendee, must be proven before a transfer of property will be set aside on the ground of fraud. This is partly true, partly not true. Where one makes a transfer of his property, with intent to defraud

creditors, to one to whom he owes no obligation to make the
transfer, and to whom he is not in any way indebted, the
party to whom the transfer is made cannot hold the property
as against creditors, even though he pay a consideration, if,
at the time of the transfer, he knows that the intent of his
vendor in making the transfer is to hinder, delay, or defraud
creditors. See *Rosenheim v. Flanders,* 114 Iowa 291. This
case involved a question of fraudulent transfer of personal
property. The court said: "Two questions are presented
by the facts for solution. First, was the sale by N. M. Flan-
ders to her brother, made with intent (on her part), to hinder,
delay, or defraud plaintiffs? Second, if there was fraud on
her part, what was the relation of J. W. Flanders (the
vendee) to the transaction? Was he a creditor, merely seek-
ing to secure his claim, or was he in the nature of a purchaser
endeavoring to make profit out of the property?" The court
answered these questions in the following language: "If
the sale was made by N. M. Flanders with intent to hinder
and delay the plaintiffs, it was fraudulent on her part, and
could be avoided against any purchaser from her, even
though he paid full value, if such purchaser bought with
notice, either actual or constructive, of the grantor's intent,"
citing *Steele v. Ward,* 25 Iowa 535; *Kellogg v. Aherin,* 48
Iowa 299, and other cases. It was there said: "The grantee,
in such a case, will be held to have constructive notice of
the grantor's intent, when he knows of such facts as would
put men of ordinary prudence upon inquiry, which, if pur-
sued, would lead to a knowledge of the grantor's purpose,"
citing *Jones v. Hetherington,* 45 Iowa 681, and other cases.
The court proceeds: "This is the rule with regard to a pur-
chaser, but it does not apply to a creditor seeking security
for his claim."

Where the sale is made to a creditor of the alleged
fraudulent vendor, and is made in satisfaction of a bona fide
debt, and is done in good faith, in payment of the debt, other
creditors cannot complain, even though it appear that the

vendor had a fraudulent purpose in making the transfer, and even though the vendee knew of this fraudulent purpose. This rule is founded on the fact that a creditor·has a right to take security for, or payment of, a just debt, even though he knew at the time that his vendor had a fraudulent purpose in making the payment at that particular time. But to this there is an exception, that if the purchaser though a bona fide creditor, knows· of the fraudulent intent of his vendor or mortgagor, and with such knowledge takes the conveyance not in good faith, for the purpose of securing or paying his debt, but for the purpose of aiding his vendor or mortgagor in his effort to defraud other creditors, he cannot be protected. The rule generally is stated this way: A creditor who acts in good faith may take security from his creditor or a conveyance of his property in payment of a bona fide debt, even though he knows that there are other creditors, and that the effect of the debtor's action will be to defeat them, and he is protected in such case, even though he knows the debtor is prompted by a fraudulent intent. But the rule stated farther is that the creditor must act in good faith; for, if he makes the purchase for the purpose of aiding his debtor to defraud other creditors, it is void, even though he pays full consideration therefor. See *Richards v. Schreiber et al.*, 98 Iowa 422. This rule is stated in the above case as follows: "But if the creditor know of the fraudulent purpose of the debtor and accept the mortgage wholly or in part to aid in accomplishing it, he participates in the wrong, and the mortgage is fraudulent against creditors, although it was only on a reasonable amount of property to secure a valid debt," citing *Headington v. Langland*, 65 Iowa 276; *Clark v. Raymond*, 86 Iowa 661.

In *Richards v. Schreiber, supra*, it was said, in substance, that the mortgagor may have believed that it was for the best interest of his creditors to place the property beyond the reach of attachment until he could realize its value in the ordinary course of business and pay his debts, and the mort-

gagee may have shared in this belief, but this did not prevent the transaction from being fraudulent in law, and it was said that the purpose of the mortgagor in giving the mortgage, as disclosed by the record, was to hinder and delay his creditors; that the mortgagee knew of that purpose and took the mortgage to aid in carrying it into effect. That tainted the transaction with fraud, and the mortgagees cannot derive any benefit from the mortgage, prejudicial to the creditors of the mortgagor.

It appears from this record that the debts assumed by Henry were bona fide debts of Samuel. It does not appear that the property in value exceeded the amount owing Henry, and the debts assumed by him. The consideration paid for the property, therefore, was not inadequate. This, however, is not controlling; for, even though the consideration paid was the fair value of the property, yet if the conveyance was made by Samuel with the purpose and intent of hindering and delaying his creditors, and was taken by his father with knowledge of this fact, and for the purpose of aiding Samuel in carrying out his fraudulent intent, the sale is void as against creditors, and this would be true even though it appear that Samuel was indebted to Henry at the time, and that part of the consideration was the payment of this obligation. The consideration may be sufficient, yet the transaction so tainted with a fraudulent purpose that it cannot stand, notwithstanding the consideration was fair and adequate. The fact of a fair consideration paid is evidence tending to negative a fraudulent purpose, but it is not conclusive on that point. Inadequacy of consideration is not always a ground for voiding a sale or conveyance made by a debtor. It is a circumstance to be considered in determining whether it was made with a fraudulent intent. It is not enough, to defeat a sale by a debtor to his creditor, that the consideration was inadequate, nor is it enough to support a conveyance that the consideration was adequate. A mort-

*2. FRAUDULENT CONVEYANCES: adequate consideration: effect when fraud shown.*

gage or transfer of all a debtor's property, whether founded upon a valuable or adequate consideration or not, made by both parties with the intent to hinder, delay or defraud creditors, is void as to them. The sale to be sustained must be made in good faith. Inadequacy of consideration or full consideration paid is a fact to be considered in determining this ultimate question.

We find the rule laid down in 20 Cyc., at page 488, as follows: "When it appears that the parties to a transaction impugned for fraud were actuated by a motive which the statute denounces as fraudulent, to wit, to hinder, delay or defraud creditors, it is utterly immaterial how valuable a consideration may have passed from the grantee or transferee, for the conveyance is none the less void in law."

This, we take it, is the general rule. The mere fact that an insolvent debtor makes a disposition of his property to some bona fide creditors, omitting others, does not, in and of itself, render the sale fraudulent as to the omitted creditors. A debtor may prefer one creditor to another in making payment out of his property.

Intent involves the mental attitude of the parties to the transaction. It may be honest, or it may be dishonest. It may involve a bona fide purpose or a fraudulent purpose. The consequences that follow the act are not solely determinative of the intent that accompanied the act. To defeat a sale, the intent to hinder, delay, or defraud creditors must exist. The intent is an act or emotion of the mind, and is arrived at by a just deduction from all the facts and circumstances proven. Where the intent on the part of the vendor is shown, either by direct evidence or facts and circumstances, the intent gives color to the act, and, if fraudulent, will, as to him, make his act of no legal efficacy, and if shared in by the vendee, and the conveyance taken for the purpose of enabling the vendor to accomplish his fraudulent purpose, it is void, whether this be shown by direct evidence or facts

and circumstances, for the reason that fraud avoids all contracts and the law gives them no efficacy for any purpose.

We will not stop to analyze this testimony. It speaks for itself and shows that the purpose and intent, both of the father and the son, in making this bill of sale, was to avoid the collection of plaintiff's judgment. The thought dominant in their minds was that it would be cheaper to beat it on execution than to incur the expense of an appeal. It is apparent that both thought plaintiff's judgment unjust, and that they were justified in defeating the collection of it in any way.

We think there was no error in the court's action and the case is, therefore,—*Affirmed*.

DEEMER, C. J., LADD and SALINGER, JJ., concur.