Ayers v. Wolcott.

DAY, C., concurs.

---

DON C. AYERS, APPELLANT, V. OLIVER S. WOLCOTT ET AL., APPELLEES.*

FILED NOVEMBER 7, 1901.   No. 10,424.

Commissioner's opinion, Department No. 2.

1. **Fraudulent Transfer:** TRANSACTION BETWEEN RELATIVES: . BURDEN OF PROOF.  When a father transfers all of his property to his children and immediately thereafter. incurs a large indebtedness for property, a large part of which he also transfers to his children, in a suit by the creditor to set aside such transfers as fraudulent the burden of proof is on the grantees to show a sufficient consideration for the transfers and that the same were made in good faith.

2. **Debt After Conveyance:** FRAUDULENT INTENT.  The fact that the debt was contracted after the conveyance was made is no defense where the conveyance was made with a view to incur the indebtedness and avoid its payment.

3. **Voluntary Conveyance:** SUBSEQUENT CREDITOR: INTENT.  A voluntary conveyance made with the intent on the part of the grantor to defraud subsequent creditors is void as against such creditors without proof that the grantees had notice of the fraudulent intent of the grantor.

APPEAL from the district court for Merrick county. Heard below before ALBERT, J.  *Reversed.*

*W. R. Morris* and *W. T. Thompson,* for appellant.

*J. C. Martin* and *John Patterson, contra.*

*Rehearing allowed.

SEDGWICK, C.

This action was begun in the district court for Merrick county by this plaintiff to set aside conveyances alleged to be fraudulent, and to subject the lands conveyed to the lien of this plaintiff's judgment. The trial court entered decree for defendants, and plaintiff has appealed.

On the 3d day of May, 1895, the plaintiff recovered a judgment in the district court for Merrick county against the defendant, Oliver S. Wolcott, for the sum of $2,292.50 and costs. The judgment was based upon a promissory note for $2,000 and interest, dated November 25, 1892. On the 23d day of November, 1892, the defendant, Oliver S. Wolcott, and Calista Wolcott, his wife, deeded the lands in controversy, consisting of about 1,400 acres, to their four children. These deeds were executed at the same time and place. They were not recorded until the latter part of 1893, when they were recorded, one on the 20th of November and two of them on the 7th, and one on the 12th day of December. In the case of *Bartlett v. Cheesbrough,* 23 Nebr., 767, the son transferred to his father a stock of goods valued at $2,600, and the good faith of the transfer was challenged by the creditors of the son. The court, after mentioning some of the facts shown in the evidence as to the consideration paid by the father for the stock of goods, says: "Under these circumstances it devolved on the defendant in error clearly to establish the good faith of the transaction, and the actual existence of the several items of the alleged debt owing by the son to him. These facts we think he has failed to prove. Transactions between relatives, by reason of which such relatives derive an advantage from credit obtained from strangers, will be scrutinized very closely, and the bona fides of such transactions must be clearly established." *Plummer v. Rummel,* 26 Nebr., 142; *Adler & Sons Clothing Co. v. Hellman,* 55 Nebr., 266.

The land constituted a tract which was, by the parties, commonly designated as the "ranch." The defendant,

Oliver S. Wolcott, with his family, came to Merrick county from Iowa about the year 1880. Some of the children came with the family at that time, but it does not appear from the evidence definitely, how many. One of the sons was then twenty-one years old, the daughter was about eleven. The evidence does not show the ages of the other sons. It seems that some of the family had been here before that time, and that part of the land in question had been bought before the family came to this state. Upon coming here Mr. Wolcott homesteaded a quarter section of the land and made it his home with his family from the year 1880 until shortly before the transaction in question, when the father and mother removed to Central City, and one of the children, the daughter, went with them and was living with them at the time of the transaction in question. The other three defendants remained upon the ranch. The land was bought in tracts from time to time, but apparently none later than ten years prior to the transactions in question. The defendants testified that the boys bought this land; for one quarter they traded thirteen cows, and another quarter was bought from the railroad company at $5 per acre on ten years time. The evidence is not very clear in regard to the particulars of the purchase of the several tracts of land. One of the boys on the witness stand was asked:

Q. Did the three boys buy this land?

A. Not in particular.

Q. Did you in general?

A. In some cases and in some instances, what belonged to one, belonged to all.

The father and his family lived on this land for about twelve years, commencing in 1880. During that time all the business was done in the name of the father; the title to all of the land was taken in his name; notes and mortgages were given by him to secure the purchase price. These notes and mortgages were paid, generally, out of the proceeds of the farm. The father had a bank account, and the stock was bought and sold by the father, and the

proceeds of sales, in some instances, and so far as the evidence shows, went to his bank account. The evidence is quite voluminous. It can not be quoted here at length. But it comes very far short of showing "the actual consideration paid" to the father and the bona fides of the transactions.

It is suggested that the deeds were executed before the indebtedness was incurred, and that the grantees were in actual possession of the land conveyed, so that this creditor had notice of the conveyances before he extended the credit. But we do not think that these are controlling facts in this case. In *Steele v. Coon*, 27 Nebr., 586, it is said: "A deed not fraudulent at first, may become so afterwards by being concealed, or not pursued, by which means creditors have been drawn in to lend their money." The fact that the debt was contracted after the conveyance was made is no defense where the conveyance was made with a view to incur the indebtedness and avoid its payment. *Echols v. Orr*, 106 Ala., 237; *Marks v. Crow*, 14 Ore., 382. When a grantor intends by voluntary conveyance to hinder and delay subsequent creditors the conveyance will be void as against creditors without showing actual notice of such intent to the grantee. *Preston v. Cutter*, 64 N. H., 461. Where the grantor is insolvent at the time of making the conveyance, want of consideration is a controlling fact on the question of fraud. *Erickson v. Quinn*, 47 N. Y., 410. Prior to the giving of the note, on which the judgment was obtained, one Heffner came from Nevada, Missouri, to sell Mr. Wolcott, the father, some horses, and was taken by him out to the ranch and shown over the ranch. There is some testimony that something was said in his presence to the effect that the boys wanted to sell the farm, but nothing to the effect that they owned it or claimed to own it, or had any further interest in selling or holding it than they had in the other business which was transacted there, all of which appeared to belong to the father. It also appears that on the day that the deeds in question were made the father went away from home,

and immediately after executing the deeds he handed them to his wife, and himself went to the B. & M. depot. He testified that he intended to go to some place in Kansas to look at some land for one of his sons, and that his son furnished him the money for the journey; but as a matter of fact he did not go to Kansas but went directly to Nevada, Missouri, and there bought four stallions, for which he gave the note in question, and another note of like amount. These stallions he took home with him. One of them died, one of them he traded for a piece of land which he took in the name of one of his sons; another he traded for another piece of land which he took in the name of another of his sons, and the fourth he took out to the ranch, where it remained and was at the time of the trial. Several disinterested witnesses testified that the elder Mr. Wolcott always claimed to own the land in question, and that after giving this note he made statements to the effect that he would not pay the note, and that he had fixed his property so that he could not be compelled to pay it. It appears that he had no other property, except this ranch, and the property thereon; and that all of the children knew that the business was transacted in their father's name; that most of it was done by him personally, that the titles to the land were taken in his name and the mortgages given thereon by him. There is no doubt that at the time he went to Nevada, Missouri, the father contemplated buying the horses in question, or at least had in mind the possibility that he might conclude to do so. He testified that when Mr. Heffner was here they talked it over a great deal, and had even gone so far as to prepare the notes, but he concluded not to execute them for some reason, not very clearly shown; and there can be no doubt from the evidence that he then had in mind the fact that he might incur a large liability while gone, which thought caused him to execute all these deeds in such great haste before he went, the grantees not being present (except one of them, the girl, to whom only eighty acres were deeded), and the deeds not being delivered until some time after his

return, and not placed upon record for more than a year thereafter. The indebtedness was incurred as soon as possible after executing the deeds in question. There was no such actual and immediate possession by the grantees as to constitute notice equivalent to recording the deeds. The lands were largely wild lands, and the grantees did not respectively occupy and have exclusive possession of the tract of land conveyed to each respectively. The father made the original purchase of the lands, and held the title for ten or twelve years, during which time the lands were occupied and controlled and treated by the defendants substantially as they were after these deeds were executed, the father to all appearances being the owner of the same, and there was no outward act that would be notice to any one of any change of title or ownership.

It is recommended that the decree of the district court be reversed and the cause remanded with instructions to enter a decree as prayed in plaintiff's petition.

OLDHAM and POUND, CC., concur.

By the Court: For the reasons stated in the foregoing opinion the decree of the district court is reversed and the cause is remanded with instructions to enter a decree as prayed in plaintiff's petition.

REVERSED.