OMAHA CATTLE LOAN COMPANY, APPELLANT, V. THOMAS
C. SHELLY ET AL., APPELLEES.

FILED JUNE 13, 1911. No. 16,164.

1. **Fraudulent Conveyances: HUSBAND AND WIFE: EVIDENCE.** If a man
   purchases real estate and causes the legal title to be vested in
   his wife, the law implies a gift from husband to wife; but in such
   a case, where the evidence proves that the husband was at the
   time engaged in a hazardous business in the name of a corpora-
   tion of doubtful solvency whose debts to its principal creditors
   he had guaranteed, that the gift was out of proportion to his net
   worth, and that he subsequently controlled the property as his
   own, and under cover of the name of another corporation invested
   the proceeds of the sale of that real estate in other property
   which he controlled as his own, that property should be sub-
   jected to the payment of his debts in existence at the time of the
   transfer of title to his wife or which he then contemplated in-
   curring.

2. **Limitation of Actions: CREDITORS' SUIT.** Ordinarily the statute of
   limitations will not run against an action in the nature of a
   creditor's bill, until the creditor's demand has been reduced to
   judgment.

3. **Creditors' Suit: JUDGMENT AS EVIDENCE.** In an action in the nature
   of a creditor's bill to set aside an alleged fraudulent conveyance
   so as to subject the property levied upon to the satisfaction of a
   judgment recovered by the plaintiff against a third person, the
   judgment, if regular on its face, is *prima facie* evidence of the
   validity and amount of the creditor's demand; but the defendant,
   if not a party or privy to the judgment, may, by pleading and
   proof, establish any just defense, in part or entire, to the demand
   which the judgment debtor might have interposed, but did not.

4. **Corporations: ESTOPPEL.** A person transacting business continu-
   ously for many years with an organization holding itself out as a
   corporation, and recognizing it as a corporation, will not ordi-
   narily, in enforcing a demand arising out of those transactions,
   be heard to question the corporate capacity of his debtor.

APPEAL from the district court for Douglas county:
WILLIAM A. REDICK, JUDGE. *Reversed with directions.*

*W. A. Corson*, for appellant.

*McCoy & Olmstead, contra.*

ROOT, J.

This is a creditor's bill prosecuted for the purpose of subjecting certain real estate in Douglas county to a judgment for $15,128.52, recovered September 30, 1907, by the plaintiff, as assignee of the Union Stock-Yards National Bank, against Thomas C. Shelly. The defendants prevailed in the district court, and the plaintiff appeals.

Omaha Cattle Loan Company is the plaintiff, and Thomas C. Shelly, his wife, Mattie E. Shelly, Chambers Academy Company, Williard E. Chambers and Ora P. Chambers are the defendants. The inquiry covers a wide range, and involves a consideration of the business transactions of several individuals, firms and corporations. The narrative cannot be other than extended, and, at best, many facts testified to must be omitted, while others that are immaterial, except as they seem to cast some light upon the motives of the principal defendants, should be stated. We have been materially assisted by the briefs, which evidence counsels' painstaking consideration of the evidence, although an occasional reference is made to facts not appearing in the record as we understand it.

In 1888 the defendant Thomas C. Shelly, while the owner of property worth from $20,000 to $30,000 became a resident of Douglas county, and engaged in the purchase and sale of live stock upon commission at the stock-yards in South Omaha. Prior to 1892 Shelly was a member of two different firms and furnished the greater part of the capital used in their business. In 1892 Shelly formed a partnership with Messrs. Blanchard and Rogers and continued in the commission business. All of these firms loaned money to live stock men, but this branch of the business was largely increased by the firm of Blanchard, Shelly & Rogers. The loans were evidenced by negotiable prom-

issory notes, bearing interest at the rate of from 7 to 10 per cent. per annum, secured by chattel mortgages which provided that the live stock should be shipped to the mortgagees to be sold on commission. These notes were discounted by the payee at various banks and financial institutions and the proceeds reloaned. In 1894 branch offices were opened and maintained in Denver and Kansas City. In 1898 the Blanchards withdrew from the firm, took over its business at Kansas City, and Mr. Shelly formed a partnership with Mr. Rogers, which continued until January 2, 1899, upon which date the corporation of Shelly-Rogers Company was formed, and it succeeded to the assets and the business of the partnership of Shelly & Rogers.· The capital.stock of the corporation, $50,000, was issued and delivered to the Messrs. Shelly and Rogers in consideration for the partnership's assets. Subsequently Shelly purchased from Rogers 75 shares of the capital stock, and, as we understand the record, paid him out of the corporation's assets. In May, 1903, Shelly-Rogers Company ceased transacting business. Out of its bills receivable notes of the face value of $117,561.16, indorsed by it as collateral security for money borrowed on the corporation's notes, proved worthless, and $32,676.48 of its paper negotiated and sold to the plaintiff could not be collected. Thomas C. Shelly contends, and there is an entry in a leaf cut out of the corporation's general ledger which may prove, that the corporation was also indebted to him in the sum of $20,704.26. The evidence does not prove that any other discounted Shelly-Rogers Company's paper could not be collected. So, therefore, giving the corporation the benefit of the presumption arising from this fact, when it ceased transacting business it owed about $67,000 it could not pay, and, after other creditors were satisfied, held about $118,000 of worthless commercial paper, some dating back to the days of Blanchard, Shelly & Rogers. In a little more than three years subsequent to this failure, the defendant Mattie E. Shelly and her relatives controlled and received the rents and profits from a dancing

academy located at the northeast corner of Twenty-fifth and Farnam streets in the city of Omaha, and from a three-story flat building, both constructed on the west one-half of lots 10 and 11, block 1, Henry & Shelton's addition to Omaha; and a valuable property in Douglas county, described as the "West Dodge street home," being the south 600 feet of the east 250 feet of the northeast corner of the northwest quarter of section 24, township 15 north, of range 12 east, except a part of Dodge street and a 33-foot strip on the east side for a road. Mrs. Shelly also has the legal title to the west 46 feet of lots 25 and 26, in block 8, Hanscom Place, an addition to Omaha. The legal title to the dancing academy and the flat property is in the Chambers Academy Company, which the defendants insist is, and the plaintiff contends is not, a corporation.

It is difficult to correctly state, within the limits of an opinion, the contentions of the respective litigants concerning the source from whence came the money to purchase and improve the real estate involved in this action and to outline their arguments to sustain those contentions. As we understand the record and the arguments, the defendants contend that Thomas C. Shelly, while solvent, made gifts to his wife of property which culminated in what is described as the "Thirty-second avenue property," lots 25 and 26, block 8, Hanscom Place; that, about the time Shelly-Rogers Company failed, and subsequent to that event, all of this property, other than the west 46 feet thereof, was converted into cash and used in connection with money borrowed from Mr. Shelly's mother and money borrowed from his sister to purchase and improve the lot upon which the dancing academy and the flats were constructed; that Willard E. Chambers, Mrs. Shelly, and a Mr. Hawk, Thomas C. Shelly's brother-in-law, furnished the money to promote the Chambers Academy Company; that this money and money borrowed upon, and the rents and profits arising out of, the real estate created the fund out of which all of these improvements were paid for.

Finally, the defendants say that the plaintiff's claim was created in November, 1902, and, since Mrs. Shelly received no presents from her husband subsequent to February, 1900, the plaintiff is without standing to question the transactions.

The plaintiff contends that the debt evidenced by its judgment had its inception as long ago as 1899; that Mrs. Shelly has at all times held the property she now claims as her own for the benefit of her husband; that Captain Hawk invested no money in the Chambers Academy, but that large sums of money, fraudulently withdrawn by Thomas C. Shelly from the assets of Shelly-Rogers Company, are invested therein; that the firm of Shelly & Rogers was bankrupt in January, 1899, when it transferred its assets to the corporation Shelly-Rogers Company, which was formed by Shelly and Rogers for the fraudulent purpose of avoiding personal liability on the indorsements of the commercial paper in which they dealt, and that the corporation at no time was a solvent concern; that the Chambers Academy Company was incorporated in furtherance of the fraudulent design conceived by Shelly when he incorporated the Shelly-Rogers Company, and that the property described in this opinion should be sold to satisfy the plaintiff's judgment.

As we have said, the evidence discloses that Shelly was worth at least $20,000 in 1888. We find little, if any, evidence to prove whether Shelly prospered prior to entering the firm of Blanchard, Shelly & Rogers in 1892. Shelly testified, in substance, that the profits of this firm aggregated $114,000 during the six years it transacted business. He does not say whether he deducted from the ostensible assets the uncollectible commercial paper accumulated by the firm during that time, but says that when the firm dissolved no money was paid to any of its members. Probably they divided the commercial paper in their possession. Thousands of dollars par value of this paper was uncollected and uncollectible in 1903 when Shelly-Rogers Company failed.

Messrs. Shelly and Rogers testified, in substance, that the firm's assets which were taken over by the corporation in 1899 were worth $80,000. The capital stock of the corporation was $50,000, so that it had an apparent surplus of $30,000. The day the articles of incorporation were signed there was a balance of $20,000 to the firm's credit at the bank where it maintained a general account; but there is no proof that this money was not the proceeds of the sale of cattle consigned to the firm and upon which it had no lien. The general tenor of the testimony of Shelly, of his brother Clarke, who became a member of the corporation and made many of the entries in its books, and of Rogers satisfies us that the firm's assets were represented by the promissory notes turned over to the corporation, the goodwill of the firm, and its tangible property, which consisted of office furniture and saddle horses. Over $66,000 of the par value of the assets of Shelly & Rogers, as shown by such of the firm's books as were preserved, were charged to the corporation's profit and loss account or were assigned by it as collateral in the fall of 1902 and later found to be valueless. The members of the firm were also liable as indorsers on a vast amount of commercial paper at the time Shelly and Rogers signed the articles of incorporation. The testimony discloses that Shelly & Rogers transacted a business of from $3,000,000 to $5,000,000 a year in commercial paper which matured in from three months to six months from its date. At the time the corporation failed, $700,000 of its rediscounts was outstanding, so that it seems reasonable to say that in 1899, when the firm incorporated, its members were liable on their indorsements for at least that sum. That liability was not conditional, but direct.

Thomas C. Shelly, his brother Clarke and Mr. Rogers testify that none of this paper was in existence when the corporation failed, but we are of opinion that the record discloses that the debts represented by many thousands of dollars par value of those notes had not been paid in May, 1903. Thomas C. Shelly was the guiding and controlling

force in the firm of Shelly & Rogers and in the corpora-
tion of Shelly-Rogers Company. A record was made in
discount registers of the pertinent facts connected with the
notes acquired by the firm or by the corporation. Not all
of these books have been preserved, but a history of
many of the notes is recorded in the books in evidence
in this case. Shelly sold his firm's and the corporation's
paper to four customers in South Omaha, two customers
in Fremont, Nebraska, one customer in Mendota, Illinois,
one in Rockford, Illinois, one in LaSalle, Illinois, and some
of the notes were negotiated by note brokers in Omaha.
All of this paper was secured, or was supposed to be se-
cured, by chattel mortgages upon live stock. At times the
firm borrowed large sums of money on its notes, and sub-
sequently the corporation borrowed money upon its notes.
If the notes taken by Shelly & Rogers or Shelly-Rogers
Company were not paid at maturity, they would take a
renewal note, attach it to the original bill, and discount
them to some customer who had not held the original in-
strument. By this course of business the corporation, until
November 1902, maintained sufficient credit at the banks
where it transacted business to take up at maturity every
note negotiated by the firm or by the corporation. Within
four months after the corporation was formed, to be exact
April 25, 1899, two of its regular customers demanded and
secured a personal guarantee from Thomas C. Shelly and
Mr. Rogers of those creditors' demands, present or future,
against the corporation, and on December 28, 1900, the
plaintiff's assignor, the Union Stock-Yards National Bank,
was also given a like guarantee to the extent of $25,000.
November 25, 1902, Thomas C. Shelly called into confer-
ence representatives of three of Shelly-Rogers Company's
principal corporate customers and one individual investor,
and stated to them that he or Shelly-Rogers Company had
misappropriated $50,000 of the proceeds of sales of cattle
mortgaged to secure notes held by these customers, and
that the corporation had suffered a loss of over $30,000
by reason of the conduct of a broker to whom they had de-

livered that amount of their paper duly indorsed, which he had sold, but had embezzled the proceeds. This broker died September 30, 1902, from a gunshot wound. Shelly stated that, if funds were advanced to tide the corporation over its financial difficulties, it would earn sufficient money within a few months to place it in good financial condition; whereupon the Union Stock-Yards National Bank accepted the note of Shelly-Rogers Company for $20,000, gave it credit on its books for that sum, and subsequently loaned Shelly-Rogers Company $13,000 more money. Other of the creditors accepted the corporation's notes, secured by collateral, to balance the misappropriated money to which they were entitled.

At this time a suit involving the right to the proceeds of the sale of a herd of cattle was pending between the Union Stock-Yards National Bank and Shelly-Rogers Company, and as a result of this conference the suit was dismissed. A supplemental contract for further support was made between the bank and Shelly-Rogers Company; but, an investigation having developed that in many cases the livestock mortgaged to secure the collateral put up to secure the borrowed money had been sold by Shelly-Rogers Company, the bank refused to advance more money, and Shelly-Rogers Company assigned what Shelly contends was all of its assets to the bank and went out of business May 2, 1903. A new commission firm succeeded to its business, and for a time the books and records of Shelly & Rogers and Shelly-Rogers Company were preserved and stored in the old office; but subsequently the sales books, the cash books, the ledger containing the trial balances, and the general ledger, with the exception of 12 leaves, were burned. It also seems probable that at least one discount register was destroyed. McCrea, a relative of Shelly's, kept books for Shelly-Rogers Company, and retained the same position under its successor in business. He telephoned Shelly that the new commission firm intended to burn the books and records, and at Shelly's request cut from the general ledger the 12 leaves which

exhibit the state of Shelly's personal account for about three months prior to the close of the corporation's business, one month's account of bills receivable, about nine months' record of the account of undivided profits, two months' record of the commission account, of the discount account, the interest account, Rogers' personal account, the expense account, and the account with the Union Stock-Yards National Bank. Some other minor accounts are also shown for a period covering three months prior to the failure. Shelly made no effort to prevent the destruction of the books and records. His counsel contend, however, that, since the records were delivered to the individual selected by the creditors to collect the assets of the corporation, Shelly had no control over the records, and is no more chargeable with their destruction than is the bank. Shelly seems to have been the only interested person to receive notice that the records were about to be destroyed, and there certainly is no presumption in his favor by reason of the fact that he selected and preserved so small a part of them and by his silence acquiesced in the destruction of evidence to establish the financial condition of the corporation and of the firm to whose business it succeeded. During all of the years Shelly & Rogers and Shelly-Rogers Company were in business, Thomas C. Shelly had no personal bank account, but transacted his private business through the firm, and later through the corporation. The Shellys both testify that Thomas C. Shelly at times deposited large sums of money with the firm or corporation to his personal credit, and that all of his disbursements on account of his private business and personal expenses were made by checks of the firm or of the corporation upon its bank account.

An examination of the records preserved and in evidence casts some doubt upon Shelly's contention that Mr. Voss, the note broker, was indebted to Shelly-Rogers Company at the time of his death. More than a month passed after the event before Shelly advanced that contention to his creditors, and the entries in the records before us show

that in the other transactions had with Shelly-Rogers
Company, aggregating over $300,000 in amount and cover-
ing at least a year of time, Voss delivered his check for
the notes at the time he received them from the corpora-
tion, and whenever he returned a note Shelly-Rogers Com-
pany gave him its check or other notes of equal value
therefor. Voss gave Shelly-Rogers Company his check
for a note purchased from it by him the day of his death.
The check was not paid because presented subsequent to
the drawer's death. No satisfactory reason is given for
Shelly-Rogers Company demanding, and Voss giving, his
check for this note while he held $30,000 of the corpora-
tion's paper for which he had not paid. Mr. Shelly's
explanation that this condition was permitted to exist be-
cause the corporation did not need the money does not ap-
peal to us as reasonable, in the light of the fact that the
corporation at that time had misappropriated thousands
of dollars of trust funds received by it from the sale of
mortgaged cattle, which it should have paid, but did not
pay and did not have the money wherewith to pay the
rightful owners. The Day note included in the list of paper
alleged to have been embezzled by Voss was, according to
the entries in the Shelly-Rogers Company books, preserved
and in evidence, paid for by Voss January 29, 1902, the day
it was delivered to him, and on August 12, 1902, the day
it matured, was satisfied by the corporation. A renewal
note taken by Shelly-Rogers Company was sold to an-
other party, who paid Shelly-Rogers Company therefor.
The evidence also proves other facts tending strongly to
discredit Mr. Shelly's contention that his corporation lost
any money by reason of any act on the part of Mr. Voss.
It is true that the deceased broker's legal representatives
paid his creditors the proceeds of his life insurance poli-
cies, and the creditors of Shelly-Rogers Company received
from that source about $7,500. It does not seem probable
that payment would have been made upon a bogus claim;
but it is also improbable that the evidence before us was
accessible in the county court when the assignee of the

corporation made his proof in the Voss estate, which was made in good faith. The evidence on this branch of the case tends strongly to prove the insolvency of the corporation and the real ownership of the property in dispute.

December 13, 1889, Thomas C. Shelly acquired title to a part of lot 1, Coburn's subdivision of block 11, West Omaha, and subsequently resided thereon. In May, 1894, he traded this tract for lot 5, block 5, Hanscom Place addition to Omaha, a vacant lot, and the title was taken in his wife's name. This lot was mortgaged and a residence erected thereon, which the Shellys occupied as their home. The defendants' counsel argue that the money secured by this mortgage was invested by Mr. Shelly in the commission business for the benefit of his wife and earned her 10 per cent. annual interest; but Mrs. Shelly testifies that this money was used to pay for the house. April 25, 1899, the day that Shelly gave the South Omaha National Bank and the Cattle Feeder's Loan Company, two of Shelly-Rogers Company's customers, his unlimited personal guarantee of their demands, present and future, against the Shelly-Rogers Company, Thomas C. Shelly paid the mortgage last referred to. May 8, 1899, this property was sold for $7,500, and the money subsequently was used by Shelly in Shelly-Rogers Company's business. Both Mr. and Mrs. Shelly say that he held this money in trust for her; but there is no other evidence to this effect. The cash book and ledger of the Shelly-Rogers Company covering this period were not preserved, nor does any witness testify that a credit was given Mrs. Shelly in any book of the company for that sum or for any other amount. From all of the evidence upon this point, we strongly incline to the opinion that the title to this property was taken in Mrs. Shelly's name as a matter of convenience; that when the real estate was sold Mr. Shelly used as his own the money acquired thereby, and that Mrs. Shelly did not question his right to do so. July 27, 1898, Shelly purchased lot 20, block 5, Hanscom Place, subsequently built a house thereon, and sold the property February 27, 1900, for $4,750.

Mr. and Mrs. Shelly testify that this house was built for their daughter; but the gift was never consummated, and the property should be treated as Shelly's. February 27, 1900, Shelly purchased lots 25 and 26 in block 8, Hanscom Place, took the title in his wife's name, and subsequently constructed a valuable house upon the premises, which they occupied as their home. The total investment in this property was about $16,000. A building permit for this house is in Thomas C. Shelly's name; he employed the architect, paid all of the bills by checks on the account of Shelly-Rogers Company, and his subsequent control of the property purchased from the money secured by mortgaging this real estate and by a subsequent sale of the greater part thereof tends strongly to prove that he was the real owner.

In December, 1902, the defendant Willard E. Chambers, and the defendant Ora P. Chambers, the daughter of Thomas C. and Mattie E. Shelly, were married. Mr. Chambers is an adept dancing master, and was then, and still is, engaged in that vocation. The evidence tends strongly to prove that Mr. Chambers at this time had little, if any, of this world's goods other than his personal effects. The evidence also proves that Mr. and Mrs. Shelly, anticipating the failure of Shelly-Rogers Company, discussed with their son-in-law the advisability of constructing and maintaining a dancing academy in Omaha, and in the early part of April, 1903, took into their confidence upon this subject Mr. Shelly's brother-in-law, Captain Hawk, a resident of Sacramento, California, who was temporarily in Omaha. May 1, 1903, a mortgage was executed on lots 25 and 26, block 8, Hanscom Place, for $6,000, and after the broker's commission was deducted Mrs. Shelly received from him a check for $5,745.85. This check was taken to the Commercial National Bank of Omaha, where Mrs. Shelly had recently opened a general account, and exchanged for a cashier's check payable to her order: She indorsed and delivered the check to Mr. Chambers. The indorsee took the check to the First National Bank of Council Bluffs, Iowa, exchanged it for a demand certifi-

cate of deposit payable to his order, and immediately returned to Omaha. May 23, 1903, Chambers delivered the certificate, $2,450 in currency, and a check for $150 to Mr. Pritchett, from whom he purchased for $9,000 the lots upon which the academy and the flats were subsequently erected. We are satisfied that Chambers furnished but $720 of the money invested in this land. July 17, 1903, Mr. Chambers, his wife, his father, and his unmarried sister signed articles incorporating the defendant Chambers Academy Company, subsequently gave the notice required by law, and filed a copy of the articles with the secretary of state. Neither the elder Chambers nor his daughter invested any money in the corporation, but a share of stock was issued to the father. The capital stock was fixed at $30,000, of which $25,000 should be paid before the corporation could transact business; 62 shares were issued to Mrs. Shelly, 63 shares to E. L. Hawk, 62 shares to Ora P. Chambers, 62 shares to Willard E. Chambers, and 1 share to L. P. Chambers. This share was subsequently transferred to Thomas C. Shelly, but at all times he was in complete control of the corporation. Willard E. and Ora P. Chambers gave their several notes to the corporation for $5,840 for the unpaid purchase price of their stock, and the day it was issued assigned the stock as security for the payment of the notes. Subsequently the corporation borrowed on the security of its property an amount equal to these notes to pay the contractor for constructing the building and to equip it. Chambers and his wife promised the corporation to pay the borrowed money, and their notes were canceled and returned to them. Thereafter Willard E. Chambers became involved, and all but one share of his stock was canceled. This stock was issued to Mrs. Shelly.

Mr. Hawk testifies, in substance, that between the early part of April and the month of August, in 1903, he transmitted to the Shellys in Omaha, by drafts or checks, $6,300 for investment in the corporation. Hawk could not state the amount of any remittance or the date it was sent. He

had no book account or letters suggesting that any money had been remitted. He had no bank account and could not tell the source from whence the money came, except that it probably represented money paid for fruit grown upon his ranches and a check drawn on a bank in Butte, Montana. Mr. Hawk did not name the county where his ranches were situated, and it seems highly improbable that, if he were receiving an income of $5,000 per annum from this property and owned property worth $45,000, he would have no bank account. The Shellys did not produce any letters from Hawk referring to remittances from him, nor were they much more definite than was Hawk concerning the details of this transaction, except that Mrs. Shelly says the money given by her to Chambers, in addition to the proceeds of the loan upon her house, for the purpose of purchasing the academy lots, was sent by Hawk, and that she thinks she received one check or draft for $1,000 and another for $2,000 in April or May of 1903. In the corporation's books Hawk is given credit for $6,300 under date of July 13, 1903. We cannot accept the evidence produced as proof that Hawk invested any money in the corporation; he certainly could have given more of the details of a transaction involving nearly one-seventh of his entire estate if it be of the value testified to by him. Stubs of the checks issued by the corporation to pay the dividends declared in 1906 and in later years purport to evidence checks to Hawk; but the checks were drawn to the order of Thomas C. Shelly or to the order of Mattie E. Shelly, and in the latter event were indorsed by Thomas C. Shelly or Mattie E. Shelly by Thomas C. Shelly, and all of the proceeds of these checks passed under the control of Thomas C. Shelly, although they went into Mrs. Shelly's bank account. The Shelly book account from May, 1903, is in the name of Mattie E. Shelly, but many of the checks drawn thereon, aggregating thousands of dollars, were signed by Thomas C. Shelly.

The academy building did not cover all of the lot purchased from Pritchett, and in 1904 Shelly built a three-

story flat thereon. In 1904 Mrs. Shelly sold to Dr. Davis the greater part of lots 25 and 26, block 8, Hanscom Place. She only appears in this deal as the grantor. Mr. Shelly attended to the transaction and executed a bond to the grantee to secure him against an incumbrance which caused some difficulty between the parties. Dr. Davis paid, all told, about $9,700, and this money was invested in the flats. Subsequent to July 13, 1903, the date Hawk was given credit for the $6,300 which the Shellys testified was invested in the academy building, and prior to the time Dr. Davis paid any money to Mrs. Shelly, she deposited $2,200 in the Commercial National Bank. No satisfactory explanation is given of the source of this fund, and it is not improbable that some of it represented the assets of Shelly-Rogers Company. In the latter part of 1906 the Shellys acquired a tract of land on West Dodge street, and in 1907 a commodious residence was constructed thereon at a cost of about $6,000. The title to this tract is in Mrs Shelly's name. The property was paid for in part by the proceeds of a loan negotiated by Mrs. Shelly, and secured by a mortgage on the property, and in part from the income arising from the academy property.

At one stage of the trial Mr. Shelly testified, in substance, that the Chambers Academy Company did not keep a cash book for some time after its organization, but cut-out leaves of its cash account were produced. The entries therein do not correspond to the undisputed facts established by other evidence, and were made, as we believe, for the purpose of confusing the reader as to the source of the money paid, for the benefit of the corporation. Mr. Chambers testifies positively that the $9,000 paid Pritchett for the lot was the only money paid in prior to the time the first loan was negotiated, which, if true, eliminates the $6,300 credited to Hawk, because the evidence discloses that all but $720 of this money was furnished by Mrs. Shelly, and the first loan was negotiated by the corporation July 14, 1903, although the first

entry charging cash with the proceeds of a loan appears under date of September 8, 1903. Had Hawk paid $6,300 on or before July 13, 1903, according to the entries in this account, the academy company would have had a much greater balance after Pritchett was paid for the lot than its books disclose. The record exemplifies the difficulty experienced in dovetailing fiction with facts, and especially when the facts principally relate to dates and to figures.

We are of opinion that, when Shelly in 1900 purchased the Thirty-second avenue property and had the title placed in his wife's name, and when subsequently he expended about $8,000 in constructing improvements thereon, Shelly-Rogers Company was not only probably insolvent, but most of its assets were safe from execution. This we say in the face of the fact that chattel mortgages were taken up on live stock to secure payment of the notes payable to Shelly-Rogers Company, and inspectors in the corporation's employ were constantly inspecting and trying to keep in touch with the mortgaged chattels. Shelly-Rogers Company's operations extended to many counties in the western part of the state, into Wyoming, and into South Dakota. It sometimes happened that owners of mortgaged live stock sold it in markets other than South Omaha and did not account for the proceeds of the sale. In one case a train load of mortgaged cattle was thus sold and no account was made of the proceeds amounting to about $20,000. If the corporation were insolvent, Shelly was not solvent. When the corporation ceased transacting business, Shelly converted into cash the property in his wife's name, and this money, in connection with other funds from mysterious sources, has been so invested as to produce a substantial fortune over which Shelly exercises complete dominion. Deducting from the aggregate established value of this property the sum of the liens thereon, there is an equity therein equal to the value of Shelly's estate at the time he embarked in business at South Omaha, while his creditors hold an aggregate of over $40,000 in uncollectible claims against him.

The defendants' counsel insist that, while the evidence may establish a few isolated suspicious circumstances, it is insufficient to establish fraud. It seems to us that the proof has progressed from the realm of suspicion into the domain of fact. This court has ever scrutinized with care transactions between relatives which have a tendency to prevent creditors from collecting their just demands. *Plummer v. Rummel,* 26 Neb. 142; *Steinkraus v. Korth,* 44 Neb. 777; *Penn v. Trompen,* 72 Neb. 273. Fraudulent transactions are planned in secrecy, and proof of their details ordinarily is known to no one other than the actors. If the parties thereto in attempting to explain the transaction fail in their purpose, the presumption theretofore existing against them is necessarily strengthened. In this case the defendants, among other things, offer the following explanations: Mr. Shelly contends that his mother, Helen Shelly, loaned his wife $2,000, which was invested in the academy property. Mrs. Shelly testifies that she borrowed $1,000 from her mother-in-law; that all of the debt has not been paid, and that she borrowed about $400 from Mr. Shelly's sister, Maud. A lead-pencil memorandum in Mr. Shelly's handwriting containing a statement of debits and credits, as we construe the writing, credits Mr. Shelly with one-half of the academy property and all of the flats, and charges him, among other things, with "mother 800." There are checks and stubs of checks of the academy company in the record showing several payments to Helen Shelly, and later to Maud Shelly, in sums of $18 and $36, respectively. These checks are uniform in amounts of either the smaller or the greater sum, and are so dated as to suggest that they were paid in satisfaction of accrued interest. The first check is dated December 26, 1903. Upon the stubs there is a notation to the effect that the check is to apply on "note." Mr. Shelly testifies that after his mother died, and by an arrangement among her heirs, Helen Shelly's estate became the property of his sister, Maud. This fact accounts for the later checks having been drawn in favor

of Maud Shelly, and it appears with reasonable certainty that, unless the rate of interest upon the loan from the elder to the younger Mrs. Shelly was less than 4 per cent. per annum, the debt did not exceed $1,000, and probably was but $800, the amount indicated in the lead-pencil memorandum, *supra*. Although these interest payments were made by the Chambers Academy Company, they are not charged to Mattie E. Shelly or to Thomas C. Shelly, a circumstance tending to prove not only that Mrs. Shelly is not the real debtor, but that Thomas C. Shelly actually owns the property controlled by the corporation. Whatever probative value this evidence may have, it discredits the testimony of Mr. Shelly and the testimony of Mrs. Shelly in exaggerating the amount of money borrowed from his mother. Mrs. Shelly also testified to having received money from her mother and from her mother's estate; but whatever she thus received came into her possession before the Thirty-second avenue property was constructed and in no manner aids in accounting for the money invested in the Chambers Academy. We have noticed that the testimony to sustain the contention that Captain Hawk invested $6,300 in this corporation is so unsatisfactory that we are compelled to reject it. So, therefore, a consideration of the explanations offered by the defendants increases rather than diminishes the presumption which the law raises against the fairness and legality of the transactions which culminated in a fortune under Thomas C. Shelly's control, but safe from the demands of his creditors.

The conclusions we draw from the foregoing are: That in February, 1900, Mr. Shelly from his course of business expected to borrow in the name of Shelly-Rogers Company large sums of money from the plaintiff, from the Union Stock-Yards National Bank, and from dealers in commercial paper. His scheme to avoid personal liability as indorser of the firm's bills by incorporating had been largely frustrated by two of the corporation's principal customers insisting upon his personal guarantee of its

debts, which he had given. In the course of business he anticipated that this demand would be made by other of the corporation's customers. Shelly-Rogers Company, if forced to liquidate at that time, could not have paid all of its obligations, and Mr. Shelly knew that fact. Under these circumstances he withdrew from the capital employed largely in the name of the corporation the $16,000 invested in the Thirty-second avenue property, and did so for the purpose of hindering, delaying, and defrauding his creditors, present and future, and the transaction cannot lawfully be sustained. *Ayers v. Wolcott*, 62 Neb. 805; on rehearing, 66 Neb. 712. Furthermore, Mrs. Shelly holds, and at all times has held, title to this property for the benefit of her husband.

Considering Mr. Shelly's financial condition and the hazardous nature of his business in 1900, and giving Mrs. Shelly the benefit of every reasonable doubt arising from a consideration of the evidence, these transactions should not be sustained further than to the extent of the homestead exemption of $2,000, the value of the property previously given her by Mr. Shelly, which should not be valued in excess of $5,000, the estate received by Mrs. Shelly from her mother valued at $1,000 and $1,000 borrowed from Mr. Shelly's mother. We make no allowance for increment to this fund by way of interest, because the Shellys have been supported out of no other fund since this property was sold. The homestead exemption is now attached to the West Dodge street property and should not be allowed elsewhere. We make no allowance for the alleged Hawk investment, because we find that he invested no money in this property. He is not a party to this action, and we do not presume to say that he will be bound by the decree that will be rendered herein; but for the purposes of this case he is eliminated as an owner of any of the property in litigation in this action.

We are of opinion that the plaintiff's contention that Shelly-Rogers Company should be treated as a partnership, and not as a corporation, cannot be sustained. Al-

though the assets of the partnership may not have equalled $50,000 in value, yet so far as we are advised, in incorporating, the partners violated no law.    They evidently placed an exaggerated valuation upon the firm's assets and unwisely loaded the corporation with the liabilities of the firm and of its members as indorsers of the discounted commercial paper; but the Union Stock-Yards National Bank dealt with Shelly-Rogers Company as a corporation and exacted the personal guarantee of its stockholders for its debts.    No part of the debt in suit was traced back to the date of the incorporation. There is some testimony of a general nature which tends to prove an opposite conclusion, but it does not identify any specific debt in existence in January, 1899, and trace it, or any part thereof, into the debt represented by the judgment which the plaintiff seeks to enforce by this action.    Shelly-Rogers Company exercised the franchises of a corporation without objection by the state for four years before it gave up the ghost.    The plaintiff, in suing Shelly and Rogers upon their guarantee, refers to Shelly-Rogers Company as a corporation, and we think the case is within the rule announced in *Kleckner v. Turk,* 45 Neb. 176.    The point therefore must be resolved against the plaintiff.

The defense of the statute of limitations fails, because the proof is satisfactory that the plaintiff did not have knowledge of the facts justifying an inference of Thomas C. Shelly's fraud until within less than four years before this suit was commenced.    Code, sec. 12.    Furthermore, the suit was commenced within two years after the judgment sought to be collected was rendered and therefore is in time.    *Ainsworth v. Roubal,* 74 Neb. 723.

It has come to our notice that, although the plaintiff during the pendency of the action in the district court upon Thomas C. Shelly's guarantee settled and dismissed the action as to Mr. Rogers, no credit was given on the claim in suit.    There may be some lawful reason for this act, and there may be no justification therefor.    If we

understand the evidence, Thomas C. Shelly, after Shelly-Rogers Company failed, conveyed to the Union Stock-Yards National bank, or to some one for its benefit, certain lots of the value of about $1,500. There is some evidence tending to prove that, as a result of the control this bank exercised over the assignee of the assets of Shelly-Rogers Company, a suit between that corporation and the bank over the proceeds of the sale of a herd of cattle was dismissed. If that claim were a just set-off, Shelly-Rogers Company should have had credit for it, and to that extent the liability of Shelly as guarantor would be diminished, and so also, the value of the lots conveyed, and the amount realized from the settlement with Rogers probably should have been deducted from the demand upon which Shelly was sued. For some reason, Shelly made no defense to the action; possibly he had none; possibly he feared to antagonize the plaintiff or its assignor; and probably he believed himself to be execution proof. So far as Thomas C. Shelly is concerned, his wife is in a position to hold the property sought to be subjected to the satisfaction of the plaintiff's judgment. To that end, can Mrs. Shelly or the Chambers Academy Company go back of the judgment recovered against Shelly and show that the claim upon which it is based was satisfied in whole or in part at the time the judgment was rendered? If they cannot, it must be because they are concluded by the judgment as Shelly is concluded. This position is sustained by *Candee v. Lord,* 2 Comst. (N. Y.) 269; *Swihart v. Shaum,* 24 Ohio St. 432; *Scott v. Indianapolis Wagon Works,* 48 Ind. 75; *Strong v. Lawrence,* 58 Ia. 55; *Ferguson v. Kumler,* 11 Minn. 62. On the other hand, in *Troy v. Smith & Shields,* 33 Ala. 469, an equitable action in the nature of a creditor's bill, it is held that the judgment is proof only of its existence, and does not bind a fraudulent grantee. We think the better rule in such actions is that the judgment, if regular on its face, is *prima facie* evidence of the amount of the debt, but that the alleged fraudulent grantee may by pleading and proof

bring forward any just defense the defendant in the action might have interposed to defeat the judgment in whole or in part. *Gottlieb v. Thatcher,* 34 Fed. 435; *Lanata v. Planas,* 2 La. Ann. 544; *Inman v. Mead,* 97 Mass. 310. The principle is also recognized in *Citizens State Bank v. Porter,* 4 Neb. (Unof.) 73.

We have not overlooked the fact that the plaintiff has suffered a considerable loss because of its inability to collect all of the notes purchased from Shelly-Rogers Company; but it did not reduce that claim to judgment, and it is doubtful whether it had a lawful claim against Shelly therefor. In the instant case, the plaintiff's rights are those of the Union Stock-Yards National Bank, and a court of equity should enforce the demand as though it were being prosecuted by the bank. It would be unconscionable for a court of equity to enforce a judgment, bearing 10 per cent. annual interest, beyond the amount justly due the judgment creditor, and the fact that the defendants have not put forward that defense should not close the eyes of this court to the real equities of the parties.

The judgment of the district court therefore is reversed and the cause remanded, with directions to permit the defendants, other than Thomas C. Shelly, if they are so advised, to amend their answers so as to set up any payment made by Shelly-Rogers Company or Thomas C. Shelly to the Union Stock-Yards National Bank upon the debt represented by the judgment upon which this action is founded, and to plead any lawful set-off or counterclaim that existed thereto on the part of the said Shelly-Rogers Company or Thomas C. Shelly, and to try those issues, if so presented, but that in any event it enter a decree subjecting the property described in this action, the legal title whereof is in the defendant Mattie E. Shelly or in the defendant Chambers Academy Company, to the plaintiff's judgment to the extent that it shall be held to represent the lawful debt of the defendant Thomas C. Shelly, saving and excepting, however, to Mrs. Shelly,

first, $2,000 homestead exemption in the "West Dodge" street property; second, from all of the property $7,000 in value, which shall represent the money derived by Mrs. Shelly from her mother's estate, money borrowed by her from Helen Shelly and owing to Maud Shelly, and the gift from her husband. The decree to protect all persons holding valid liens upon the property, and to protect the interest of the defendant Willard E. Chambers, or his vendee, in the property of the Chambers Academy Company to the extent of the par value of one share of its capital stock.

REVERSED.

FAWCETT, J., not sitting.