E. G. FORD, Appellee, v. RUDOLPH OTT et al., Appellants.

FRAUDULENT CONVEYANCES: Evidence—Conveyances Between 1 Relatives. Evidence relating to a transfer by parents to a son reviewed, and held sufficient to show that the same was made and received with the intent to defraud the creditors of the grantor.

JUDGMENT: Conclusiveness—Non-Privies—Fraudulent Convey- 2 ances—Defenses. Whether an alleged fraudulent grantee, defendant in an action to set aside a conveyance, and to subject

the land to a non-fraudulent judgment against the alleged fraudulent grantor, may attack the plaintiff's said judgment (to which he was not a party), and plead a defense thereto which the judgment defendant might have pleaded, but did not, *quaere*.

*Appeal from Fayette District Court.*—A. N. HOBSON, Judge.

OCTOBER 20, 1917.

REHEARING DENIED JANUARY 18, 1918.

THE defendants Rudolph and Alwine Ott are husband and wife, and Albert Ott is their son. Plaintiff, sometime prior to the commencement of this suit, obtained judgment in the district court of Fayette County against Rudolph and Alwine Ott for $7,968.74. This judgment is based upon a $4,400 note executed by Rudolph Ott, May 9, 1907, to Adam Kiefer. The payee named in said note, with his brothers, was, at the time of the execution thereof, engaged in the banking business at Hazelton, Iowa, under the name of Kiefer Brothers Bank, in which it is claimed plaintiff had large sums on deposit, to evidence which he held certificates of deposit. He claims that the $4,400 note was turned over to him on June 4, 1907, as collateral security for the payment of the certificates of deposit. Later, the exact date not appearing in the evidence, but probably in 1912, Rudolph and Alwine Ott executed a new note to Adam Kiefer for $8,000, to take the place of the $4,400 note, securing the payment thereof by a mortgage upon the real estate hereafter described. Later, Kiefer Brothers Bank became insolvent, and suit was brought in the name of plaintiff herein, and judgment entered upon the $4,400 note against Rudolph and Alwine Ott, as above stated.

No defense was offered to the suit upon the $4,400 note; although attorneys were employed by Rudolph Ott for that purpose, but they retired from the case before judgment was entered. At the time of the execution of both notes, Rudolph Ott was the owner of the North ½ of the North

West ¼, Section 28, and the East ½ of the North East ¼, Section 29, all in Township 91, Range 10, Fayette County, Iowa, which, on February 16, 1914, he and his wife conveyed by warranty deed to Albert Ott for a purported consideration of $12,000. On the same day, they executed to Albert Ott a bill of sale, conveying to him 17 cows, 3 two-year old heifers, 5 yearling calves, 1 bull, 5 horses, 2 colts, 2 calves, and all farm machinery, vehicles, gasoline engine, and farm implements. The consideration expressed in the bill of sale was the same as that in the deed.

By the terms of the deed, Albert assumed and agreed to pay the $8,000 mortgage, and by a certain written instrument, agreed to pay a note of $1,000 owing by his father to the grandfather, Mathias Ott, and a note of $2,000 to Fred Brickman, a half-brother of his father's. The remaining $1,000 is represented by the amount agreed upon between the father and son as due the latter for wages earned since his majority.

Two suits were brought by plaintiff against the defendants, which were consolidated, however, and tried together: one, to set aside and cancel the deed to the real estate; and the other, to set aside and cancel the bill of sale to the personal property, and subject the same to the payment of the judgment above referred to. Each suit was based upon the claim that the above instruments were executed without consideration, and for the fraudulent purpose of defeating the collection of plaintiff's judgment. Decree was entered by the court, dismissing the petition to set aside the bill of sale, and setting aside and cancelling the deed, and decreeing the judgment a lien on the real estate. The defendant Albert alone appeals.—*Affirmed.*

*Jay Cook* and *Rollin J. Cook,* for appellant.

*E. R. O'Brien* and *R. J. O'Brien,* for appellee.

STEVENS, J.—I. The testimony offered

1. FRAUDULENT
CONVEYANCES:
evidence:
conveyances
between rela-
tives.

on behalf of plaintiff consisted of the record of the judgment upon the $4,400 note, the warranty deed and bill of sale, and the return of an unsatisfied execution, together with the testimony of the scrivener who wrote the deed and bill of sale, and that of two or three other witnesses, who testified that appellant had, to some extent at least, worked away from home since he attained his majority. According to the testimony of the scrivener, who was assistant cashier of a bank in Oelwein, the parties to the deed and bill of sale came to the bank and requested him to prepare the same for them; that but little was said; that Rudolph gave him the consideration as $12,000; and that he sent the instruments for record.

Albert Ott was also called by the plaintiff, but nothing of importance was elicited from him. Called in his own behalf, he testified that he was 25 years of age, and had resided at home with his father and mother all his life; that, after he became 21, he had an understanding with his father that he was to be paid $30 per month for his services on the farm, but that, prior to the execution of the deed and bill of sale, no part thereof had been paid to him; and that it was agreed between his parents and him that, in consideration of the conveyance to him of the farm and personal property, he would pay the mortgage on the farm, and two notes to relatives, as evidenced by the following written instrument:

"Fairbank, Iowa, Feb. 16, 1914. For value received and as part consideration for purchase price of farm and other property, I hereby assume and agree to pay to Mathias Ott the note held by him against Rudolph Ott in the sum of one thousand dollars, and to Fred Brickman the note held by him of two thousand dollars."

The balance of the consideration is represented by the

wages claimed to be due him from his father.   Albert testi-
fied that the above-written instrument was made at the same
time and place as the deed and bill of sale.   He further tes-
tified that but little was said between his father and him
relative to the purchase of the farm, before the deed and
bill of sale were executed, and that he was uncertain whether
he knew that notice had been served of the suit on the $4,400
note, prior to the execution of the above papers.   He be-
came very much confused on cross-examination, and ap-
peared to have a somewhat imperfect understanding of the
latter transaction, except that he was clear in his statement
that he was to pay the $2,000 note to his father's half-
brother, the $1,000 note to his grandfather, the $8,000 mort-
gage on the farm; and clear as to the agreement with ref-
erence to wages claimed to be due him from his father.

Rudolph Ott testified that he was 54 years of age, had
a family of nine children, eight of whom, including Al-
bert, resided with him on the premises in question; that he
was afflicted with rheumatism, and unable to do manual
labor to any considerable extent; that, since the execution
of the deed, the family has all resided on the premises; and
that Albert thereafter took charge, and has since managed
and operated the farm, and received the income therefrom.
Concerning the written instrument signed by Albert, in
which he agreed to pay the notes to his father and half-
brother, he testified that he did not know when same was
made out, but thought probably the day following that on
which the other instruments were executed; but from his
evidence it appears that he either did not know when or
where it was made out, or evaded giving the information.
Apparently, the first he knew of the instrument was when
it was given to him by Albert.   He was emphatic in his
statement that he was not at Fairbank the day the deed
and mortgage were executed.

No witness testifies that there had been any conver-

sation between the parties concerning the written instrument before the same was handed to the father by Albert. The witness Rudolph further testified that the consideration for the note to his father represented the aggregate of several sums borrowed at different times: the first, eight years before, when a daughter was buried, and that to his half-brother, two separate loans of $1,000 each, which had been made to him sometime prior to the date of the notes, which was in 1914, the exact date not appearing in evidence. The written instrument, after being retained by him for a while, was returned by the father to Albert, according to his testimony, to be kept for him. The scrivener who wrote the deed and bill of sale testified that he had no recollection of at any time preparing the written instrument above referred to. Rudolph also testified that the only income derived by him and his family from the farm, since the conveyance to Albert, has been their living; and that, during the period after Albert attained his majority, and prior to the execution of the deed and bill of sale, he had purchased some clothing for Albert and received the wages earned by him; but that he had never paid him anything for his services until the execution of the deed and bill of sale.

Neither the father nor the son was at all clear or specific as to details concerning any of the transactions between them, and they were confused upon cross-examination. There is no direct evidence of an agreement or understanding between the parties, before they went to the bank to have the papers made out. The consideration named was suggested by the father, and the inference may fairly be drawn, from what was said and done at the time, that the agreement on the part of Albert to pay the notes aggregating $3,000 was not discussed, and had not yet been considered. Albert at first stated that he did not know of the notes until after they returned from the bank, and

later, that they were discussed at the bank.  The father makes no claim of this kind, and the scrivener remembers no mention thereof.

Albert knew that the note and mortgage executed to secure the payment thereof were intended to be in payment of the $4,400 note and interest thereon; and Rudolph stated that he did not want to pay the debt twice, but that the execution of the deed and bill of sale had nothing to do therewith.  Both denied that any agreement had been made for a reconveyance of the farm and personal property, or that the written instrument was not to be binding upon Albert.  The two notes claimed to have been executed, one to Mathias Ott and the other to Fred Brickman, were not offered in evidence, nor is there any testimony concerning them, except as above stated.

The value of the land and personal property covered by the deed and bill of sale is not shown, nor was any evidence offered by either party in regard thereto.  If we assume that the consideration named in the instrument represented the fair value of the property conveyed, it is a circumstance in favor of the *bona fides* of the transaction; but, on the other hand, the evidence shows that the parents and other members of his father's family continued to reside thereon and derive their living from the proceeds of said premises, which would tend, at least, to indicate that Albert, after paying full value, had assumed an unlikely burden, or was good-naturedly permitting a substantial part of his income to be appropriated to the benefit of the former owner of the land and family.  Albert possessed no other property than the above.

Rudolph claims to be unable to perform manual labor, several of the children are young, and it would seem quite improbable that he would divest himself of his home and all property of every kind after he had become unable to work, without making provision for the support of himself

and wife, and at least the younger children. It is hardly probable that Albert, in good faith, paid value for the land and personal property, and in addition thereto, took upon himself the burden of supporting his father, mother, brothers, and sisters. It is, of course, conceivable that Rudolph might prefer his son, father, and half-brother, as creditors, to the plaintiff; but it is not so clear that he would strip himself of every means of providing a livelihood for himself and family; but this is not claimed.

Where the written instrument was prepared, by whom, and why the same purports to have been executed at Fairbank, if it was made out at Oelwein at the time the deed and bill of sale were executed, as claimed by Albert, does not appear in the evidence, and no good reason therefor has been suggested. If the understanding between the parties, at the time the deed and bill of sale was signed, or prior thereto, was that Albert was to pay the $3,000 in notes, the written instrument would have been prepared at the same time, and dated at Oelwein, and there would doubtless have been no discrepancy in the testimony of witnesses in relation thereto, or difficulty in establishing when and where same was executed. It is impracticable to set out the evidence in detail; and, while there is no direct evidence of a fraudulent agreement between the parties, yet, when taken as a whole, such is apparently the only reasonable inference to be drawn therefrom.

There is no doubt that Rudolph and his wife had given a new note and mortgage upon the farm to secure the payment thereof, to take the place of the $4,400 note to Adam Kiefer, and that he had failed to exchange the former for the latter, but had left the same in the hands of plaintiff, and probably disposed of the new note to other parties.

While the rules to be applied in cases of this character have often been stated, attention is, nevertheless, called to the following:

A sale or conveyance with the intention upon the part of the grantor to hinder and delay his creditors is fraudulent, and could be avoided against any purchaser from him, notwithstanding he paid full value, if such purchaser had actual or constructive notice of the grantor's intent. *Rosenheim v. Flanders,* 114 Iowa 291; *Steele v. Ward,* 25 Iowa 535; *Kellogg v. Aherin,* 48 Iowa 299; *Preston v. Turner,* 36 Iowa 671; *Bixby v. Carskaddon,* 55 Iowa 533; *Kelley v. Flory,* 84 Iowa 671.

Constructive notice exists where the grantee knew of his grantor's intentions, or of such facts as would put an ordinarily prudent person upon inquiry which, if pursued, would lead to a knowledge of grantor's purpose. *Rosenheim v. Flanders,* supra; *Jones v. Hetherington,* 45 Iowa 681; *Lyons & Dickey v. Hamilton,* 69 Iowa 47. If, however, the purchaser is a creditor in good faith, and seeking payment or security for his claim, the conveyance to him will not be fraudulent, even though he knows of other creditors, and that the effect of the debtor's action will be to defeat them. *Rosenheim v. Flanders,* supra.

But he must act in good faith; for, if he takes the conveyance for the purpose of aiding in the fraud, it is void. *Rosenheim v. Flanders,* supra; *Richards v. Schreiber, Conchar & Westphal Co.,* 98 Iowa 422.

A creditor may also take a conveyance that secures debts due to others, as well as to himself. *Gould, Draper & Co. v. Hurto,* 61 Iowa 45; *Roberts, Butler & Co. v. Press,* 97 Iowa 475.

To amount to such fraud as would justify the court in setting aside a conveyance on account thereof, both the grantor and grantee must either have participated therein, or the grantee must have possessed such notice as would have put him upon inquiry as to grantor's intention. *Tenold v. Klimesh,* 160 Iowa 410; *Atkinson v. McNider,* 130 Iowa 281; *Witham v. Blood,* 124 Iowa 695.

It is also well settled that an insolvent debtor may lawfully mortgage all his property for the security of a portion of his debts, even though nothing is left for those unsecured. *Southern White-Lead Co. v. Haas,* 73 Iowa 399; *Rollins v. Shaver Wagon & Carriage Co.,* 80 Iowa 380.

Transactions between relatives will be scrutinized closely, where fraud is charged, but it will not be imputed to them because of the relationship alone. *Conry v. Benedict,* 108 Iowa 664.

The Supreme Court of Missouri, in *Mason v. Perkins,* 180 Mo. 702 (79 S. W. 683), said:

"When a father strips himself of everything he owns that is subject to execution, in the face of a suit pending against him and about to be tried, and conveys his property to his son in alleged payment of a very vague and uncertain claim for services that have been rendered to him by his son years before, it is a fair circumstance to be construed in determining the *bona fides* of the conveyance."

In *Lyons & Dickey v. Hamilton,* 69 Iowa 47, this court uses the following language:

"Where a purchaser of the property is not a creditor, but a mere volunteer, and the seller intends by the sale to hinder, delay, or defraud his creditors, it is not necessary that it should be shown that the purchaser bought 'with a like fraudulent intent.' It is enough if it be shown that the purchaser had knowledge of such facts as would charge him with notice of the fraudulent intent of the seller."

And again, in *Thompson v. Zuckmayer,* (Iowa) 94 N. W. 476, this court said:

"Transactions between members of a family or others in close confidential relations will be scrutinized closely, but the law gives the relative or friend the same right to protect himself in the collection of a claim, and the same right to purchase property, which is enjoyed by a stranger, and to set aside such a transaction, the burden remains upon

the party alleging fraud to prove it. It is shown that Albert Zuckmayer was indebted to intervenor in quite a large amount, growing out of various dealings between them, and the land conveyed was taken with the burden of a mortgage. We see no good reason for holding that intervenor, in receiving the deed, acted fraudulently. He apparently paid full value for the land, and his acts, so far as disclosed by the record, are entirely consistent with good faith on his part."

See, also, *Smyth v. Hall*, 126 Iowa 627; *Strong v. Lawrence*, 58 Iowa 55; *Elwell v. Walker*, 52 Iowa 256; *Crary v. Kurtz*, 132 Iowa 105; *Richardson v. Richardson*, 134 Iowa 242.

While the burden rested at all times upon the plaintiff to establish fraud, as appears from the cases above cited, and notwithstanding his failure to make such proof in chief, yet, when the evidence is taken as a whole, the burden seems to have been met.

It is not claimed that the several instruments were executed and conveyance made for the purpose of paying or securing the notes held by the father and the half-brother of Rudolph, or the $1,000 claimed to be due Albert; but the claim of appellant is based wholly upon the alleged purchase of the farm and personal property by Albert. It may be assumed that the consideration stated in the deed represented the fair market value of the land, but the testimony relating to the alleged claim for services due the son, and the execution of the written agreement signed by him to pay the $3,000 in notes, lack the characteristics of genuineness. There is much in the transaction from which a voluntary conveyance may be inferred, and that the arrangement to pay the $3,000 in notes originated long after the deed and bill of sale were executed. It is not even clear that the notes were in existence at that time. The original notice in the suit upon the $4,400 note was served January

13, 1914, and same was returnable at the term of court convening the 26th of the same month; but judgment was not entered until April 26, 1915. The deed and bill of sale were executed February 16, 1914; but whether the notes were executed before or after the deed and bill of sale appears only as the same may be inferred from the testimony of Albert to the effect that they were mentioned at the bank, and that he learned for the first time thereof after his return home from the bank. Why the notes were not produced, and the exact date thereof shown, is not explained. When testifying regarding the purchase of the farm and the execution of other notes by Rudolph to Adam Kiefer and his former indebtedness, he (Rudolph) manifested a fairly good recollection; but when testifying regarding the transaction in question, he was uncertain and indefinite in many particulars. If the transaction was voluntary upon the part of the father, or if Albert participated in the intention on his part to defraud the plaintiff, or knew of his father's intention to do so, or had knowledge of such facts with reference thereto as would have put an ordinarily prudent person upon inquiry, he cannot be treated as a purchaser for value in good faith.

The circumstances in evidence would seem to leave no doubt that the father was seeking to avoid the payment of the Ford judgment, and that the son was affording him such assistance as he could, to do so.

2. JUDGMENT: conclusiveness: non-privies: fraudulent conveyances: defenses.

II. It is also claimed, in argument by counsel for appellant, that, even though the $4,400 note may, in a sense, have been pledged by the bank as collateral security for the payment of certificates of deposit held by appellee, yet that Kiefer was the agent of appellee for the collection thereof, and that the execution of the new note and mortgage to Kiefer operated to discharge the $4,400 note in the hands of appellee. There is evidence in

the record tending to show that, while Ford probably held
the note as collateral security, as claimed, Kiefer had con-
trol thereof for the purpose of collecting the interest; and
he testified on cross-examination, as a conclusion, to his
authority to collect the principal.

Rudolph and Alwine Ott, at the time of executing the
$4,400 note, also executed a mortgage on a part, at least, of
the premises above described, to secure the payment there-
of. Some time after the execution of the new note and
mortgage, Kiefer released the former mortgage. The evi-
dence does not show whether the mortgage had been kept
with the note, or not.

It was held, in *Omaha Cattle Loan Co. v. Shelly,* 89 Neb.
502 (131 N. W. 926), by the supreme court of Nebraska, that
an alleged fraudulent grantee is entitled to make any de-
fense against a judgment sought to be made a lien upon
the land conveyed that would have been available to the
judgment debtor; and *Gottlieb v. Thatcher,* 34 Fed. 435,
*Lanata v. Planas,* 2 La. Ann. 544, *Inman v. Mead,* 97 Mass.
310, and *Citizens' St. Bank of Wood River v. Porter,* (Neb.)
93 N. W. 391, are cited to sustain this holding.

The contrary doctrine was adopted in this state in
*Strong v. Lawrence,* 58 Iowa 55, where it is held that a
judgment in a case similar to the one at bar could not be
attacked collaterally except upon the ground of fraud, or
that same was erroneously or unlawfully entered. There
is no pretense in this case that the judgment in question
was obtained in a way to make the same vulnerable to at-
tack under the holding in the above case. The court as now
constituted do not fully approve the holding of the above
case. We leave the matter open for future consideration,
should the question be presented.

While the evidence in this case is not, in all respects,
wholly satisfactory, it is a matter of common knowledge
that direct proof of fraud between parties related as we find

them in this case is seldom possible. Fraudulent transactions are ordinarily planned secretly, and proof thereof, if adduced at all, must come from one or more of the principals. The court will always scrutinize with care transactions between relatives which have a tendency to prevent creditors from collecting their just demands; and if, from all the facts and circumstances shown, the fraudulent character of the transaction is made to appear by that degree of proof required, they will not be upheld.

The demeanor and appearance of witnesses upon the stand while undergoing cross-examination were peculiarly within the observation of the trial court, and much weight must necessarily be given to its conclusions in matters of this character.

We reach the conclusion that the judgment appealed from should be—*Affirmed.*

PRESTON, C. J., WEAVER and GAYNOR, JJ., concur.